[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
September 13, 2012
JOHN LEY
CLERK

_____

No. 09-14257

_____

D.C. Docket No. 07-00129-CV-CDL

ROBERT WAYNE HOLSEY,

Petitioner - Appellant,

versus

WARDEN, Georgia Diagnostic Prison,

Respondent - Appellee.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

(September 13, 2012)

Before CARNES, BARKETT, and EDMONDSON, Circuit Judges.

CARNES, Circuit Judge:

In the early morning hours of December 17, 1995, Robert Wayne Holsey

robbed a convenience store in Milledgeville, Georgia, and fled. Minutes later his car was stopped by Baldwin County Deputy Sheriff Will Robinson. The deputy, who was twenty-six years old, approached the vehicle. Holsey shot him dead. Fourteen months later, in February of 1997, a jury convicted Holsey of malice murder and armed robbery. The jury fixed his sentence at death on the malice murder conviction, and the court imposed that sentence. He has been on Georgia's death row for the past fifteen years.

During those fifteen years, Holsey has exhausted his state court direct appeal and state postconviction challenges. See Holsey v. State, 524 S.E.2d 473 (Ga. 1999) (direct appeal) [Holsey I]; Holsey v. Schofield, No. 2000-V-604, Sup. Ct. of Butts Cnty. (May 9, 2006) (Final Order on Amended Petition for Writ of Habeas Corpus) [Holsey II]; Schofield v. Holsey, 642 S.E.2d 56 (Ga. 2007) (collateral appeal) [Holsey III]. Holsey's convictions and death sentence were affirmed on direct appeal. Holsey I, 524 S.E.2d at 480. In the state postconviction proceedings, the trial court vacated Holsey's death sentence, concluding that his trial lawyers had rendered ineffective assistance at the sentencing phase of Holsey's trial in regard to presentation of mitigating circumstances evidence about his limited intelligence and his troubled, abusive childhood. Holsey II, No. 2000-V-604, at 82–84. The Supreme Court of Georgia reversed, however, holding that

2

Holsey had not shown that he was prejudiced by his trial lawyers' alleged failures. Holsey III, 642 S.E.2d at 60–62.

In November 2007, Holsey filed a 28 U.S.C. § 2254 petition for a writ of habeas corpus. The district court denied that petition on July 2, 2009. Holsey v. Hall, No. 3:07-cv-129(CDL) (M.D. Ga. July 2, 2009) [hereinafter Holsey IV]. Holsey moved for a certificate of appealability, which the district court granted on two issues:

(1)     Whether reasonable jurists could disagree that the Georgia Supreme Court's decision, which reversed the grant of sentencing relief as to [Holsey's] ineffective assistance of counsel claim, was based on unreasonable determinations of fact, and/or on an unreasonable application of clearly established federal law, and/or was in contravention of clearly established federal law; [and]

(2)     [Whether] the Georgia Supreme Court's affirmance of Georgia's unique reasonable doubt standard for mental retardation claims contravenes and/or unreasonably applies established U.S. Supreme Court precedent prohibiting the execution of mentally retarded offenders and mandating federal Due Process constraints on state burdens of proof meant to protect fundamental federal constitutional rights. (Quotation marks omitted.)

After the district court granted the COA on those issues, we resolved the second issue in another case. In Hill v. Humphrey, 662 F.3d 1335, 1360–61 (11th Cir. 2011) (en banc), we held that the Georgia Supreme Court's decision affirming

3

the state's reasonable doubt standard for mental retardation claims did not contravene clearly established Supreme Court precedent. Our <u>Hill</u> decision disposes of the second COA question. This opinion addresses the first one.

## I. THE TRIAL

On January 8, 1996, a Georgia grand jury indicted Holsey for malice murder, felony murder, and armed robbery. Four days later the State filed a notice of its intent to seek the death penalty. The trial court appointed Andrew Prince as lead counsel to represent Holsey at trial, and Brenda Trammel served as Prince's co-counsel.

## A. The Guilt Phase

The guilt phase of Holsey's trial began on February 1, 1997. As the Supreme Court of Georgia has recounted, the State at the guilt phase proved the following:

> Robert Wayne Holsey robbed a Jet Food Store in Milledgeville with a handgun shortly before 1:30 a.m. on December 17, 1995. Holsey received money from both the cash register and the lottery machine after telling the store clerk, "Bitch, I want you to give me all your money." Holsey's voice was recorded on the store's surveillance videotape and was identified at trial by Holsey's girlfriend. Holsey fled the convenience store in a red Ford Probe automobile he had borrowed from his sister's girlfriend earlier that night. The red Probe was stopped at the Royal Inn Motel approximately four minutes later by Deputy William Edward Robinson, IV. Deputy Robinson made a radio call identifying the red Probe's license plate number and then

4

approached the automobile holding a flashlight. Deputy Robinson received two bullet wounds, one to his right arm and one to the back of the right side of his head. Deputy Robinson managed to fire several shots before sustaining the fatal head wound.

After the shooting, another deputy spotted the Probe and turned his patrol vehicle around to give chase, but the Probe sped away and escaped. Witnesses observed the Probe traveling at a high rate of speed through a red light and into lanes of oncoming traffic. One witness who knew Holsey testified that she saw him alone in the Probe as it passed by at the red light.

Having thus far evaded capture, Holsey called his girlfriend, Mary Jackson, and asked her to pick him up at his sister's house. He specifically directed Jackson to come in her blue Jeep Cherokee vehicle rather than in her burgundy-colored automobile. When Jackson arrived at Holsey's sister's house, Holsey called to Jackson from behind a fence on a hill. Holsey had changed clothes since he left Jackson's house several hours earlier. Jackson refused Holsey's request to take him to his mother's house so he could monitor a police scanner, but Jackson did agree to his request to drive him past the motel where the murder had occurred and then back to his sister's house by way of back roads. When back at his sister's house, Holsey directed Jackson to park her Jeep Cherokee behind the Probe to conceal its license plate. As Holsey and Jackson sat in the parked Jeep Cherokee, a police officer spotted the Probe and verified that its license plate number matched the license plate number in the victim's radio call. Holsey exited the Jeep Cherokee, refused the officer's command to put his hands up, looked around as though searching for an escape route, and then ultimately surrendered.

Law enforcement officers discovered, hidden near Holsey's sister's house, clothing that matched the clothing worn by the armed robbery perpetrator and a hat belonging to Jackson's son. The murder weapon was concealed nearby and was later found by a civilian. Holsey's tennis shoes were taken from him after his arrest, and expert testimony showed that one of the shoes had blood on it with DNA consistent with the victim's blood. Holsey gave strong physical resistance and screamed loudly when officers initially attempted to conduct a gunshot residue test on his hand. A trace metal detection

5

test of Holsey's hand was administered later and rendered a result consistent with Holsey's having held the murder weapon, which was metal with wooden grips. A bullet recovered from the Probe was matched with Deputy Robinson's service weapon. The bullet retrieved from Deputy Robinson's head during his autopsy was matched with a handgun belonging to Holsey's girlfriend, Mary Jackson. Jackson testified that Holsey admitted to her after the murder that he had taken the handgun.

Holsey III, 642 S.E.2d at 59.

On February 11, 1997, the jury returned a verdict finding Holsey guilty of malice murder, felony murder, and armed robbery, although "[t]he felony murder conviction was vacated by operation of law." Id. at 475 n.1. The sentencing phase of Holsey's trial began the next day.

## B. The Sentencing Phase

At the start of the sentencing phase, the jury learned about Holsey's criminal record for the first time. The State introduced his 1983 guilty plea conviction for armed robbery with serious bodily injury. For that crime, the state trial court had sentenced Holsey to be "confined at labor for twenty years," with fifteen years to be served in prison. The State called Scott Maher to testify about facts underlying the conviction. Maher testified that he was working as a night clerk at a Milledgeville convenience store on July 8, 1983. Holsey, who was eighteen years old at the time, entered the store, hit Maher in the face with a brick,

6

and emptied the store's cash register.[1]  After Maher's testimony, the State

introduced evidence that Holsey was paroled in July 1990 after serving seven

years of that sentence and placed on probation for the remainder of his sentence.

The State next introduced Holsey's 1992 guilty plea convictions for two

counts of aggravated assault and one count of possession of a firearm by a

convicted felon.  Based on those convictions, the state trial court had revoked his

probation for the 1983 armed robbery conviction and ordered him to serve the

remaining term of that sentence in prison.   The court had also sentenced Holsey to

five years probation for the three 1992 convictions, to run consecutively with the

remainder of the sentence for the 1983 conviction.  The jury heard all about that at

the sentencing phase of Holsey's capital murder trial.

The jury also heard more details concerning the crime leading to Holsey's

three convictions in 1992 for aggravated assault and felon in possession.   Kenneth

Simmons testified that, while he was at the Soul Master's Lounge in Milledgeville

on February 22, 1992, Holsey attacked him from behind and stabbed him four

times with a knife.  As a result of Holsey's attack, Simmons was knocked out and

suffered a punctured lung.  Scotty Simmons, who is Kenneth Simmons' first

---

[1] The State also called two Milledgeville law enforcement officers, whose testimony corroborated Maher's.

7

cousin, testified that he was at the Soul Master's Lounge when Holsey attacked

Kenneth Simmons. After the attack, Scotty Simmons decided to "go get" Holsey

and do him some harm, but Holsey fired a rifle at him seven or eight times.[2] The

State rested.

Holsey's attorneys, Prince and Trammel, then presented evidence of

mitigating circumstances. Trammel began by playing for the jury the videotaped

deposition of the owner of the Soul Master's Lounge. His name is Clifford

Holsey, although he is not related to petitioner Robert Wayne Holsey. (We will

refer to this witness as "Clifford" to avoid confusion.) The first thing that Clifford

testified about was the night Holsey stabbed Kenneth Simmons. He said that

Kenneth and Scotty Simmons had gone to the Soul Master's Lounge that night to

attack Holsey. He also told the jury that, although he did not see the stabbing,

Holsey had acted in self-defense.

Trammel also questioned Clifford about Holsey's childhood. Clifford

testified that Holsey grew up in Clifford's neighbor hood, so he had known Holsey

since Holsey was a small child. Trammel asked Clifford "to tell the jury what [he

---

[2] The State also called Bertha Simmons and Cathey Bell to corroborate the testimony of
Kenneth and Scotty Simmons. Bertha Simmons testified that she saw Holsey stab Kenneth
Simmons at the Soul Master's Lounge, and Bell testified that she also saw Holsey stab Kenneth
Simmons and that she saw Holsey fire a rifle at Scotty Simmons.

8

knew] about [Holsey] and the circumstances of his home life" growing up.

Clifford responded:

> Well, I think [Holsey] came up the best that he could. I think he was neglected from his mother. She, you know, kinda of like—came up kind of like child abuse. And she just didn't see about them, you know, kind of walked all over them a little bit, and done everything.
> [Holsey] and [his siblings] were really not cared for and—I don't know. But I believe [Holsey] might have left home that one time because their mother was really tough on them. I think she was out kind of like courting around a little bit . . . .

Clifford also told the jury that Holsey grew up without his dad, who had moved to Detroit after being shot and paralyzed, and that he had heard Holsey had a bed-wetting problem until he was about twelve years old.

Clifford explained to the jury that Holsey and his siblings dressed as "[b]est they could by living in the projects" and that their house was "rough" and infested with cockroaches. Trammel asked Clifford, "Did you ever see [Holsey's mother] put her arms around her children and tell them that she loved them?" He answered, "Never done that." Clifford testified that he had heard Holsey's mother admit that she would curse at, "scold[,] . . . and beat" her children. He told the jury that Holsey's mother threatened her children and often left them home alone because she cooked at night for the Soul Master's Lounge. Clifford explained that despite his bad life while a child, Holsey was not a "bad person" but instead was

9

"quiet and kept a smile on his face."

Trammel asked Clifford about Angela Holsey, who was Holsey's second-oldest sister. Clifford said that Angela had spent time in "special ed when she was small." According to Clifford, "[s]he did have problems."

After the jury watched Clifford's videotaped deposition, Prince and Trammel called eight more witnesses to testify live: Delores Cook, Belinda Hawkins, Freda Webb, Ferrlando Jones, Otis Paschal, Sandra Kendrick, Regina Reeves, and Demetra Holsey. The jury heard first from Delores Cook, who was a cook at the Baldwin County Jail where Holsey was incarcerated after his 1992 convictions. She testified that Holsey had worked in the kitchen as a "trustee" giving "out trays to the other inmates." According to her, Holsey was "courteous" and "respectful" and did not cause any trouble.

The jury then heard from Belinda Hawkins, a friend of Holsey's. Hawkins testified that she and Holsey went together to the Soul Master's Lounge on February 22, 1992. According to Hawkins, Holsey told her later that Kenneth Simmons had hit him in the head with a brick and then three men attacked him. She insisted to the jury that Holsey "didn't start no fight" that night.

Freda Webb, a jailer for the Jasper County Jail, was the next witness. She testified that she knew Holsey as an inmate at the Jasper County Jail where he had

10

been awaiting trial on the malice murder, felony murder, and armed robbery charges. She described Holsey as "a real courteous[,] . . . model inmate[]." Webb also testified that she did not believe that he "should get the electric chair" or that he would be a danger to others in prison.

After Webb testified, Prince called three of Holsey's former coworkers from the Milledgeville Pizza Hut. The first was Ferrlando Jones, the restaurant's assistant manager. He testified that Holsey was not a violent person, that he got along with the restaurant's other employees, and that he did what he was told to do. Otis Paschal, the restaurant's manager, testified that Holsey "was a very good employee," was "dependable," did what he was told, and got along well with others. He also told the jury that Holsey was "the quiet type" and that he never saw any violent tendencies in Holsey. The last former Pizza Hut coworker to testify was Sandra Kendrick, one of Holsey's supervisors at the restaurant. She testified that Holsey was a good employee. She also told the jury that she was at the Soul Master's Lounge when Holsey stabbed Kenneth Simmons in 1992 and that Simmons had started the fight by hitting Holsey "beside the head."

Prince next called Holsey's oldest sister, Regina Reeves, to testify.[3]

---

[3] When Reeves testified at Holsey's trial in 1997 her last name was still Holsey. She married after the trial, taking her husband's name, and she thereafter testified again in 2003 during the postconviction proceedings. For consistency, we will refer to her as "Reeves"

11

Reeves is a former marine, a former Baldwin County deputy sheriff, and a Deputy United States Marshal. Prince began the examination by asking Reeves about the fight when her brother stabbed Kenneth Simmons. Reeves said that she did not witness the fight but that during it her brother had suffered head injuries requiring stitches. Prince asked her about Holsey's incarceration at the Baldwin County Jail, which began in 1992. According to Reeves, through good behavior Holsey had earned "trustee status," which gave him more freedom within the jail than nontrustee inmates. Jail officials entrusted Holsey with miscellaneous tasks at the jail and allowed him to drive a truck.

Reeves also testified about Holsey's childhood. She told the jury that Holsey is a middle child. He has two older sisters, Reeves and Angela, and two younger ones, Demetra and Lisa. Reeves, Angela, and Holsey have the same father, but he is not the father of Demetra and Lisa. Holsey's father was shot and paralyzed two months before Holsey was born. The family moved to Detroit after Holsey was born so that his father "could get better medical attention." While they lived in Detroit, Holsey's sister Demetra was born, and after five years in Detroit, Holsey's mother and her children moved back to Milledgeville, leaving Holsey's father behind. According to Reeves, Holsey never "really knew [his

throughout this opinion.

12

father] at all."

Back in Milledgeville, Holsey and his now-four sisters (Lisa was born after they moved back to Milledgeville) lived with their mother, usually in public housing. Their mother received public assistance to help provide for her family, but Reeves testified that "things were horrible" in their household. She recounted how their mother would often beat the oldest three children: Reeves, Angela, and Holsey. Because she "hated it there" and "was tired of taking beatings," Reeves left home when she was seventeen years old and joined the Marine Corps. She later became a Deputy Sheriff and then a Deputy United States Marshal.

Reeves told the jury about Holsey's mother's involvement in his life. She testified that their mother had once been hospitalized for psychiatric problems and pointed out that she had not even bothered to show up for the sentencing phase of her son's trial. According to Reeves, Holsey's mother had not been there for most of his life. And although their mother had men in and out of the home while they were growing up, none of those men had spent any time with Holsey. Instead, Reeves testified that raising Holsey and her other siblings was "left up to [her]," and without a mother or father around, Holsey "more or less" grew up on the street.

Prince asked Reeves about Holsey's school performance. She testified that

13

he "didn't do well" and told the jury that he "might have made it to the tenth grade," but didn't complete that grade. Teachers had usually just assigned Holsey to the next grade instead of actually passing him into that grade. During Reeves' testimony, Prince introduced Holsey's school records into evidence, and he asked Reeves to read from a section entitled "teacher's remarks." Reeves then testified:

> A:  . . . For the first grade says, a weak student in readiness materials. Second grade says, very slow, needs help from home. Third says, poor worker. Fourth says, poor worker. Fifth says, can be controlled with firm discipline and a few kind words. Very, very low I think it says.
>
> Q:  The part I'm interested—can be controlled with discipline and a few kind words.
>
> A:  Yes.
>
> Q:  And needs help from home.
>
> A:  Yes.
>
> Q:  Now, did [Holsey] get any help from home from his Mama?
>
> A:  No.
>
> Q:  Did he get a few kind words from his Mama?
>
> A:  Back in those times, no.

Reeves also testified that, after spending some time in foster care, as a teenager Holsey had lived for a time at the Georgia Department of Human

14

Resources' Youth Development Center. Prince introduced into evidence Holsey's records from that center, which showed that his mother voluntarily admitted him to the center in January 1980, when he was fourteen years old.

Those records also include a pyscho-social evaluation of Holsey that was prepared by a behavioral specialist and a psychologist on July 31, 1980. According to that evaluation, when Holsey was fourteen years old, he was expelled from school because he "pulled a butcher knife (which he had brought from home)" and held it to another student's throat and "hit him in the face but did not cut him." A juvenile complaint report, which also was in the Youth Development Center records, stated that the school had ordered Holsey not to return unless his mother accompanied him.

Other evidence showed that Holsey's mother did not accompany him back to school. At Prince's request, Reeves read from a juvenile complaint report contained in the records:

> The first part says . . . that [Holsey] was basically a runaway case. He has no supervision at home and refuses to return home. Says Mrs. Holsey would not go to the school, and sent a note with [him]. [Holsey] was not allowed to return. When he tried to come back the principal called the police to remove [him].

Prince also asked Reeves to read a section of the psycho-social evaluation to the jury, which described Holsey as borderline mentally retarded:

15

"[Holsey] evidenced an inappropriate effect during the evaluation. He smiled inappropriately and had difficulty maintaining thought patterns. At times he appeared unaware of his immediate environment, and in a world of his own." Another paragraph says, "present testing indicates [Holsey] functions in the borderline mental retardation range of intelligence. . . . [H]e appears as an anti-social individual who thrives on taking risks or thrill seeking. He exhibits an inability to plan ahead and make short or reckless disregard for the consequences of his actions. His socialization relationships are shallow, and he can be expected not to show strong loyalties to others because his intelligence is so low his dislike for social convention is likely to result in his being caught often."

Reeves also recounted to the jury that the evaluation stated that academic testing had showed that Holsey, who was fifteen years old at the time of testing, functioned at a third-grade level.

Another part of the evaluation, which was introduced into evidence, states that "[p]ersonality testing indicates [Holsey] is not showing any distress or guilt" about putting the knife to his schoolmate's throat and that "[h]is social adjustment is so marginal if something is not done soon he will continue to cause problems." The evaluation reflected that Holsey had taken an IQ test on July 28, 1980, and scored a 70. The evaluation concluded that Holsey "is probably seriously disturbed." A summary of a home evaluation conducted by the Youth Development Center, also contained in the records submitted into evidence, stated that Holsey's mother "has no idea how to control [him] without resorting to

16

excessive punishment."

The Youth Development Center records admitted into evidence at the sentencing phase also contained a psychiatric evaluation of Holsey prepared by Dr. Fred Trest, one of the center's psychiatrists. Dr. Trest had concluded that Holsey suffered a "behavioral/personality disorder, which includes . . . [an] antisocial component" and that "his intelligence seems to be borderline." Holsey had told Dr. Trest that neither he nor his siblings had been treated "neglectfully" or had "received physical or verbal abuse from his mother," but "he readily admit[ted] . . . that he has felt relatively rejected by his mother for his younger siblings." He also told Dr. Trest that his mother "'yell[ed] at him,'" "infrequently 'slap[ped] him on the head,'" and "intermittently spanked him with a belt" as punishment when he misbehaved. And Holsey "reveal[ed] that his mother's present boyfriend is a friend to him . . . [who] takes him fishing and boat riding, and plays football with him."

Dr. Trest's evaluation reported that Holsey was twice suspected of attempting suicide while at the Youth Development Center but that Holsey denied it. The evaluation concluded that, at the time, Holsey "has just barely as many antisocial behaviors as must be present in the childhood histories of adults who are diagnosed as having antisocial personality disorders." Dr. Trest also wrote

17

that Holsey admitted "to having had the antisocial urge to steal in the past."

The Youth Development Center records also contained a "social history" of Holsey written by Rosa Marks, a center social worker. Marks wrote the history sometime after Holsey was admitted to the center, and she noted that he "was doing fair in school until a year ago." She summarized Holsey's situation: "[His] strength is in his physical environment and his average intelligen[ce]. His limitations lie[] in his inability to express himself adequately. His mother has given up all hopes and has little interest in [Holsey]."

In addition to eliciting testimony from Reeves about Holsey's troubled, abusive childhood, Prince asked her about Holsey's other older sister, Angela. Reeves testified that Angela was a violent person, had problems at school, was sometimes bad to her children, and had been hospitalized several times at Central State Hospital for mental problems. The first time that Angela was admitted to Central State Hospital was when "she was kicked out of public school in the fourth grade" because "[t]eachers were horrified of her." According to Reeves, Angela attended special education classes while she was at Central State Hospital.

Reeves said that as a child Holsey had rarely gotten into any trouble on his own but instead "it was usually . . . with or because of . . . Angela." She told the jury that to get reward money Angela had turned Holsey in to the police for his

18

1983 armed robbery. To Reeves, at least, Angela's betrayal was not surprising; still, Holsey never confronted Angela about it.

Prince introduced into evidence Angela's medical records from Central State Hospital. Those records show, among other things, that when Angela was eleven years old the Juvenile Court of Baldwin County ordered her admitted to Central State Hospital for a "neurological work-up, electro-encephalogram, and a complete review and evaluation of her personality." During that court-ordered stay, hospital officials found her to be in "the Borderline range of intellectual functioning" and concluded that "the consideration of Mild Mental Retardation cannot be entirely ruled out." The officials found that Angela's personality "reflected a great deal of hostility, insecurity, and depression and indicated that Angela was easily angered, could not control her anger, and did not understand it, partially due to her intellectual level." And a Central State Hospital evaluation when Angela was sixteen years old "considered [her] to be functioning in a mild mental retardation range." All of that evidence was put before the jury.

Finally, Reeves told the jury about her brother's character. She stated that he has "always been mostly quiet" and she "used to tease him . . . about things because he was always small and skinny." But, she testified, "he's always . . . been the type that if you're his friend or if you're . . . family . . . he sticks up for

19

you.  He stands . . . by you . . . no matter what."  According to Reeves, Holsey

would do just about anything to protect his sisters and his mother.  She believed

that he did not have the ability to take advantage of the same opportunities that she

did because he does not have "what you would call good social skills.  [He's]

never really been, you know, that good in school."

As Holsey's ninth and last witness during the sentencing phase, Trammel

called Demetra Holsey, one of Holsey's younger sisters.  Pleading with the jury to

spare her brother's life, she testified:

> [W]henever I need[ed] him he was there. . . .  No matter what the
> problem was, if he could help us he would.  When times got hard with
> me, when people put me down I always had somebody I could go to
> that would lift my head up and let me know I am somebody.  No
> matter what you said, you couldn't take that away from me.  You
> know, I was always picked at because of my size.  He always told me
> I was beautiful, no matter what.  People look at me from the inside,
> not the outside.  Just keep my head up and one day God will bless me.
> . . . .
> 	I'd just like to say please, I beg of you, spare his life . . . .  I
> never had a father.  My real father died when I was a baby.  He was
> my only father figure. . . .  There's some good in everybody. . . .  I
> don't have no other male figure in my life.  I have a child of my own,
> and his father's gone . . . , and I got to live a single mother's life . . . .
> But I need something.  If it ain't but a little bit, just please leave me
> something.

The parties then presented their closing arguments.  The prosecutor began

by telling the jury that the State had proven four statutory aggravating

circumstances: (1) "Holsey committed murder against a peace officer . . . while [that peace officer] was engaged in the performance of his official duties," see Ga. Code Ann. § 17-10-30(b)(8); (2) "Holsey shot and killed Will Robinson for the purpose of avoiding, interfering with, or preventing a lawful arrest of himself," see id. § 17-10-30(b)(10); (3) "Holsey murdered Will Robinson while he was engaged in the commission of another capital felony, . . . armed robbery," see id. § 17-10-30(b)(2); and (4) "Holsey . . . murdered Will Robinson while he had a prior record of conviction for a capital felony, . . . . [the 1983] armed robbery," see id. § 17-10-30(b)(1).

The prosecutor then discussed Holsey's evidence of mitigating circumstances. He said:

> Ladies and gentlemen, yes, the defendant did not have a perfect childhood. The fact that his sister turned him in for an armed robbery to get a reward, does that justify his robberies and killing a police officer?
> Yes, he's got another sister that has got some mental problems. Does that justify what he's done? No doctors have told us that Robert Wayne Holsey has any mental problems.
> . . . .
> Regina Holsey, she grew up in that same family. Same mother, same father, same household. When Regina turned 18 years old, she wanted to make something of her life. She joined the United States Marine Corps. . . .
> When [Holsey] turned 18, he robbed a Corral Convenience Store. And you heard him take that brick, and he smashed it in the face of Scottie Maher. Same age as Regina, same parents, same

21

environment, same conditions.

. . . .

. . . Robert Wayne Holsey is the ox that gores and gores again.

Trammel presented closing arguments on behalf of Holsey. She began by acknowledging that the State had proven four statutory aggravating circumstances. She then defined a mitigating circumstance for the jury as "anything that you want to consider or may consider that might just indicate to you that the ultimate punishment in this case is not what should be given."

Trammel highlighted for the jury Holsey's troubled, abusive "home life," noting that he "grew up by himself." Arguing that "[w]e don't all start equally," Trammel told the jury that Holsey "had nothing that every child deserves to have. He was deprived of everything." He "had a mother who wouldn't even go to the school so he would get back in."

She also highlighted Holsey's limited intelligence, telling the jury that Holsey is "borderline mentally retarded." She reiterated that point by reminding the jury that he "was just assigned [to grades] for school" and that by the time he was eighteen years old he still could not sign his name. Finally, she asked the jury to consider any lingering doubt it might have about Holsey's guilt to weigh in favor of not imposing the death penalty.

The court instructed the jurors that it was their "duty to determine within the

22

limits prescribed by law what punishment [would] be imposed in this offense" and told the jurors that they were "authorized to consider all of the evidence received here in court in both stages of this proceeding presented by the State and the defendant." After deliberating for less than two hours, the jury returned a verdict finding that the State had proven four statutory aggravating circumstances and fixing Holsey's sentence at death for the malice murder conviction. The state trial court imposed that sentence for that conviction and also sentenced Holsey to life imprisonment for the armed robbery conviction.

On direct appeal the Georgia Supreme Court affirmed Holsey's convictions and the death sentence. Holsey I, 524 S.E.2d at 480. The court found, "considering both the crime and the defendant, that the sentence of death was neither excessive nor disproportionate to the penalties imposed in similar cases." Id. The United States Supreme Court denied Holsey's petition for a writ of certiorari, Holsey v. Georgia, 530 U.S. 1246, 120 S.Ct. 2695 (2000), and his petition for rehearing, Holsey v. Georgia, 530 U.S. 1297, 121 S.Ct. 17 (2000).

II. STATE POSTCONVICTION PROCEEDINGS

After the Supreme Court denied certiorari, Holsey filed a petition for a writ of habeas corpus in Georgia state court raising thirteen grounds for relief. One of those grounds for relief, which is the only remaining ground at issue in this appeal,

was that his trial lawyers rendered ineffective assistance at the sentencing phase by failing to present enough mitigating circumstance evidence of his limited intelligence and of his troubled, abusive childhood.

The state collateral court held an evidentiary hearing on June 16–18, 2003, and December 8–9, 2003. Holsey called eight witnesses to testify: Dr. Mark Cunningham, Dr. Jethro Toomer, Brenda Trammel, Ronald Singer, Judge L.A. McConnel, Jr., Cathy Crawford, Regina Reeves, and Andrew Prince. He also submitted 224 exhibits, including the deposition testimony of nineteen people, the affidavits of fifty-two people, and his Department of Corrections records. The State called nine witnesses to testify: Dr. Thomas Sachy, Evelyn Luton, Dr. Kris Sperry, Mark Robinson, Sheriff William Masse, Jr., Fred Bright, Ricky Horn, Jimmie Baggett, and Howard Sills. The State submitted 220 exhibits.

The state collateral court vacated Holsey's death sentence, concluding that his trial lawyers had rendered ineffective assistance at the sentencing phase of Holsey's trial in regard to the presentation of mitigating circumstances evidence about his limited intelligence and his troubled, abusive childhood. Holsey II, No. 2000-V-604, at 82–83. The Georgia Supreme Court assumed that Holsey's trial lawyers had rendered deficient performance, but it reversed the state collateral court. The Georgia Supreme Court held that even if Holsey's trial lawyers were

24

deficient, Holsey had not shown that he was prejudiced by that deficiency.  Holsey III, 642 S.E.2d at 60–62.

The State contends that Holsey's trial lawyers did present enough mitigating circumstances evidence at the sentencing phase.  Because the Georgia Supreme Court's conclusion that Holsey was not prejudiced by his trial lawyer's assumed deficiencies was neither an unreasonable application of clearly established federal law nor based on an unreasonable determination of the facts, we will assume that Holsey's trial lawyers were deficient, as the Georgia Supreme Court did.

A. Mitigating Evidence Presented at the State Collateral Evidentiary Hearing

During the evidentiary hearing Holsey's collateral counsel called two witnesses to testify about his limited intelligence—Dr. Mark Cunningham and Dr. Jethro Toomer.  They called his oldest sister, Regina Reeves, to testify about his troubled, abusive childhood.  As additional evidence of his limited intelligence and troubled, abusive childhood, they submitted the deposition testimony of eight people and the affidavits of twenty-nine more.  Holsey's collateral counsel also submitted some documentary evidence, including his Department of Corrections records.

1.  Holsey's Witnesses

a.  Dr. Cunningham

The first witness to testify for Holsey at the evidentiary hearing was Dr.

Mark Cunningham, a clinical and forensic psychologist whom the court

recognized as an expert in those fields.  He was hired to evaluate Holsey's

intellectual status and determine whether he is mentally retarded.[4]

Dr. Cunningham gave his opinion that Holsey is mildly mentally retarded.

He explained that:

> There's a broad misconception that the public has that somebody
> who's mentally retarded is slobbering and stuporous and can't fasten
> their clothes correctly and is unable to hold a job, could never learn to
> read or write at all.  In other words, the popular notion of what it
> means to be mentally retarded in fact is more descriptive of somebody
> who is severely to moderately retarded. . . .  And so there are broad
> misconceptions in the community about what it means to be mentally
> retarded and what somebody who's mildly mentally retarded can do
> or not do.

Dr. Cunningham's diagnosis of Holsey as mildly mentally retarded was

based on the definition of mental retardation in the Fourth Edition of the

Diagnostic and Statistical Manual of Mental Disorders.  See Diagnostic and

Statistical Manual of Mental Disorders (4th ed. 2000) [hereinafter DSM-IV).

According to him, DSM-IV "is the diagnostic classification system that's utilized

---

[4] Holsey also submitted Dr. Cunningham's written report on those topics.

by psychologists and psychiatrists so that [they] are all talking about the same disorder." Dr. Cunningham also explained that DSM-IV is accepted within his professional community, and its definition of mental retardation is consistent with the definition provided by the American Association of Mental Retardation, which is "an association that began in 1876 and represents the primary professional organization" concerned with mental retardation.

Dr. Cunningham testified that a diagnosis of "[m]ental retardation has three prongs to it."[5] The first is that the person must have intellectual abilities that are "significantly subaverage, which is defined as . . . an IQ score of approximately 70 or below." However, the DSM-IV and the AAMR recognize that "an IQ score of 75 and below [c]ould also qualify because, in fact, that may well represent a true IQ that's less than 70 with [an] error component taken into consideration."

---

[5] As stated in the DSM-IV: "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning . . . that is accompanied by significant limitations in adaptive functioning in at least two of [ten] skill areas . . . . The onset must occur before age 18 years . . . ." DSM-IV, at 41.

Georgia similarly defines mental retardation as "having significantly subaverage general intellectual functioning resulting in or associated with impairments in adaptive behavior which manifested during the developmental period." Ga. Code Ann. § 17-7-131(a)(3); accord DSM-IV, at 41. In Stripling v. State, 401 S.E.2d 500, 504 (Ga. 1991), the Georgia Supreme Court explained that the "significantly subaverage intellectual functioning" factor of the mental retardation definition "is generally defined as an IQ of 70 or below." According to the court, however, "an IQ test score of 70 or below is not conclusive" because "an IQ score is only accurate within a range of several points, and for a variety of reasons, a particular score may be less accurate." Id.; accord Hill, 662 F.3d at 1341 n.6; see also infra pp. 30–31, 37.

27

The second prong of a mental retardation diagnosis is a significant impairment in adaptive behavior, which means significant impairment in at least two of ten adaptive behavior categories listed in the DSM-IV. Those ten categories are communication, self-care, home living, social interpersonal skills, use of community resources, functional academic skills, self-direction, work, leisure, and health and safety. According to Dr. Cunningham, there are two standardized tests an evaluator can administer to determine whether someone has a significant impairment in adaptive behavior: the Vineland Social Maturity (or Adaptive Behavior) Scales or the AAMR's Adaptive Behavior Scales.[6] Dr. Cunningham described those tests:

> Typically, the adaptive behavior scales use a respondent who has had close observation of the individual . . . , you're talking to [someone] who has had experience observing this person in various roles and in intimate daily life activities over an extended period of time. And you then query this person in a very detailed sort of way, following the questions that are laid out in the scale about what this person can do or is not able to do.

Dr. Cunningham also explained that an evaluator can "get information on an anecdotal basis by interviewing or getting depositions from a broad variety of

---

[6] Dr. Cunningham explained that the Vineland Scales "provide[] information about how [the patient] compares to community members as opposed to individuals that are mentally retarded." He also said that the AARM Scales "provide information about how [the patient] compares to other individuals who are developmentally disabled, to other people that are mentally retarded."

third parties, and that provides additional information about somebody's adaptive behavior capabilities."

The third prong of a mental retardation diagnosis is that there must be "the onset of mental retardation before the age of eighteen." Dr. Cunningham explained that there are degrees of mental retardation. "The highest functioning level of mental retardation is called mild mental retardation[, which is] a misnomer because there's nothing mild about this condition. It's a catastrophic disability."[7] According to Dr. Cunningham, mild mental retardation represents an IQ score from 50 to about 70 or 75. Below it is moderate (IQ of 40 to 55), severe (IQ of 20 to 40), and profound (IQ of 20 or below) mental retardation.

---

[7] Unlike Dr. Cunningham, the DSM-IV does not describe mild mental retardation as "a catastrophic disability." According to the part of the DSM-IV that Holsey's collateral counsel submitted into evidence at the evidentiary hearing:

> Mild Mental Retardation is roughly equivalent to what used to be referred to as the educational category of "educable." This group constitutes the largest segment (about 85%) of those with the disorder. As a group, people with this level of Mental Retardation typically develop social and communication skills during the preschool years (ages 0–5 years), have minimal impairment in sensorimotor areas, and often are not distinguishable from children without Mental Retardation until a later age. By their late teens, they can acquire academic skills up to approximately the sixth-grade level. During their adult years, they usually achieve social and vocational skills adequate for minimum self-support, but may need supervision, guidance, and assistance, especially when under unusual social or economic stress. With appropriate supports, individuals with Mild Mental Retardation can usually live successfully in the community, either independently or in supervised settings.

DSM-IV, at 43.

To perform his evaluation of Holsey, Dr. Cunningham reviewed "a very large set of records," which included the results of IQ tests that Holsey had taken in the past; deposition testimony; sworn affidavits;[8] arrest records; and school, Department of Corrections, and other institutional records. Dr. Cunningham also administered to Regina Reeves, Holsey's sister, the Vineland Adaptive Behavior Scale and the AAMR Adaptive Behavior Scale. He used Reeves because he believed that she is "the most reliable and functional member of [Holsey's] family."

Dr. Cunningham testified that Holsey satisfied the first prong of the mental retardation test. He reviewed three IQ tests that Holsey had taken, one in 1980, when he was fifteen years old; one in 2001, when he was thirty-six years old; and one in 2003, when he was thirty-seven years old. Holsey scored a 70, 69, and 71 on those tests. According to Dr. Cunningham, because Holsey took those tests across a twenty-three-year period, the clustering of his IQ score within three points showed "an extraordinarily reliable demonstration of his actual intellectual

_____

[8] Dr. Cunningham reviewed affidavits, which Holsey also submitted into evidence during the evidentiary hearing, from the following people: Essie Anderson, Donald Foster, Sandra Frances, Mary Havior, Belinda Hawkins, Angela Holsey, Demetra Holsey, Henry Holsey, Jr., Annie Howard, Rosa Ingram, Ferrlando Jones, Thomas Lee, Billy McGriff, Louvenia Melchor, Lelia Powell, Sonya Rooks, Sara Simcox, Hugh Tucker, Robert Warner, Freda Webb, Dr. Herbert Ebert, and Holsey's mother.

capability."

Dr. Cunningham also testified that Holsey was "significantly impaired" in eight of the ten adaptive behavior categories: communication, home living, social interpersonal skills, use of community resources, functional academic skills, self-direction, leisure, and health and safety. He also noted that Holsey's global adaptive behavior functioning is "in the eight year old range." And based on Holsey's score on the 1980 IQ test and other anecdotal evidence, Dr. Cunningham testified that there was an onset of mental retardation before Holsey turned eighteen. For those reasons, Dr. Cunningham testified that Holsey is mildly mentally retarded, "which . . . does not reflect a mild disorder, but rather the mild end of a continuum of severe disability."

### b. Dr. Toomer

The next witness Holsey's collateral counsel presented was Dr. Jethro Toomer, a forensic psychologist whom the court recognized as an expert in that field.[9] He testified that, in December 2001 when Holsey was thirty-six years old, he performed a psychosocial evaluation on Holsey to determine whether Holsey is mentally retarded.[10] As part of that evaluation, Dr. Toomer administered the 2001

---

[9] Holsey also submitted Dr. Toomer's written report.

[10] According to Dr. Toomer:

31

IQ test on which Holsey scored a 69 and administered a WRAT "to assess overall achievement functioning as it relates to a particular grade level." On the WRAT that Dr. Toomer gave him, Holsey scored equal to the fifth-grade level in reading and spelling, and equal to the fourth-grade level in math.

Dr. Toomer testified that he reviewed "several things," including Holsey's school records and "affidavits filed by a variety of family members and people who knew him during his developmental years." He also interviewed Reeves and administered to her the Scales of Independent Behavior, Revised. Based on all of that information, Dr. Toomer testified that Holsey shows "deficits in a variety of" adaptive behavior categories and that there is some evidence that he suffered an onset of mental retardation before turning eighteen. In Dr. Toomer's opinion Holsey is mentally retarded.

### c. Regina Reeves

Holsey's collateral counsel called his oldest sister, Regina Reeves, to testify

---

[A] [p]sychosocial evaluation is . . . a kind of history taking. It's a semistructured interview where the individual is asked a series of questions regarding his developmental history from birth up to the present time. And as part of that information getting, the individual is observed regarding his overall presentation, clinical presentation, intellectual and cognitive presentation, how the person responds to questions asked, [and] how the individual processes information. All that is part of the observational piece that occurs in conjunction with the taking of the psychosocial history.

about his childhood. The first part of her testimony was about Holsey's upbringing in Detroit. She testified that Holsey often saw their mother and father fight, "[s]ome physical; a lot of verbal." One time their father hit their mother with the handle of a broom or a mop, and another time their mother set a milk carton and a newspaper on fire and threw them on top of their father, who was confined to a wheelchair.

Reeves also testified about Holsey's life after their mother moved him and his siblings back to Milledgeville. According to Reeves, their mother suffered from psychological problems, including "depression and some other stuff," and the family lived in a "horrible" economic situation as their mother struggled to earn enough money to provide for the family. Before she went on welfare, their mother earned money by working long hours in cafeterias, babysitting, and cleaning other people's homes. Because their mother worked so much, Reeves "more or less played the role as the mother."

Reeves testified that the family did not always have enough food to eat. Their mother gave eating priority to Holsey's two younger sisters. Reeves testified about a time when Holsey "got up the nerve to ask for something else to eat and [his mother] made him eat, you know, everything that was left in the pot, the [chicken] bones, the rice, the chicken, everything."

Reeves said that their mother was hard on her children, especially the oldest three: Reeves, Angela, and Holsey. For example, she was often in a bad mood and regularly spoke negatively about their father. When Reeves, Angela, and Holsey realized that she was in a bad mood, they would try to hide but often with little success. As a result, they suffered a lot of verbal and physical abuse.

Reeves described Holsey as "always quiet, nervous, and small" and said that he stuttered "really bad" until he was "[w]ell into his twenties." Instead of trying to build up Holsey's self-confidence or getting him help for his stuttering, their mother would berate and make fun of him. She told him that "he was just like his no-good-ass daddy" and that "he was going to be a punk and a sissy." And she told him that he had a "can't talk ass" and that he couldn't "talk worth a shit." She would also "curse[] out [and] humiliate[]" her son. Reeves said that although Holsey wet the bed until he was thirteen years old, his mother never took him to the doctor or tried to help him with that problem.

Reeves testified that "[i]t wouldn't take much of anything" to set their mother into a violent rage, and she provided examples of the physical abuse Holsey and Angela suffered. According to Reeves, their mother would beat her children "[s]ometimes daily, every other day," and that sometimes she beat them outside of the home, "[i]n the yard, on the porch[,] [Holsey] got beaten on the

34

corner . . . right there near our house."  Reeves said that their mother would beat

Holsey with extension cords, shoes, and a broom, and would hold his head under

the bathtub faucet as he struggled and cried.  She said that those beatings left

permanent scars on his body.

Testifying about a specific beating, Reeves recounted:

[O]ne night in particular[, when Holsey was twelve or thirteen,] my
mother waited because she knew [he was going to wet the bed] that
night.  And the mattresses were cheap, and everything, so when he
peed the bed you could, the water went right through.  And when she
heard it she woke him up out of his sleep with an extension cord. . . .
Just beat him with the extension cord and made him go wash up and,
you know, clean up the mess.

Reeves also testified that Holsey witnessed his mother abuse his sister

Angela in a particularly brutal way on two occasions.  On one occasion, she

intentionally burned Angela using a wall heater, and on the other, she beat Angela

to the point that Angela was unconscious and Reeves and Holsey "thought she was

dead."

Reeves stated that Holsey had never lived on his own and that he could not

do household chores, like "taking care of things or cleaning up."  She also thought

that Angela had influenced Holsey's behavior.  According to Reeves, Angela had

been in prison a number of times, has psychological problems, and was

institutionalized as a juvenile.  Angela began getting in trouble when she was

35

"really small," and she and Holsey would often get into trouble together. But Reeves believed that Angela was always the leader and Holsey sometimes got into trouble because of things that Angela had done. Holsey rarely told on Angela and would sometimes cover for her. Reeves stated that after Holsey got out of prison for his robbery conviction and then for his probation violation, he moved in with Angela, which Reeves thought was not a good idea "[b]ecause of how [Angela] lived her life, the people that she had there," and "the influence that she would have over him."

### 2. The Depositions and Affidavits

#### a. Dr. Marc Einhorn

Holsey's collateral counsel submitted into evidence the deposition testimony and the written report of Dr. Einhorn, a clinical psychologist who had actually been hired by the State in connection with the collateral proceeding to evaluate whether Holsey is mentally retarded. Dr. Einhorn testified that, in conducting his evaluation of Holsey, he did two things. First, he interviewed Holsey in person and administered psychological testing on April 24 and 25, 2003. Second, he reviewed the records that Holsey and the State provided him, which his written report states are the same records that Dr. Cunningham and Dr. Toomer reviewed in conducting their evaluations.

36

During the interview, Holsey told Dr. Einhorn that he had begun reading in prison and that he read books, including the Bible, although he did not read every day. In his report, Dr. Einhorn summarized the interview: "[C]ommunication adequate. Thought processes were coherent, logical, and goal directed. He did not ask any questions during the examination . . . ."

Dr. Einhorn administered to Holsey an IQ test and a WRAT. On the IQ test, Holsey scored a 71. On the WRAT, he scored in the first percentile (fourth-grade level) in reading and in the fourth percentile (fifth-grade level) in spelling and math. Based on that psychological testing, Dr. Einhorn testified that Holsey met the first prong of the DSM-IV definition of mental retardation.

Dr. Einhorn also testified that Holsey shows significant deficits in some adaptive behaviors, which is the second prong of the DSM-IV diagnosis for mental retardation. He explained, however, that those deficits and Holsey's low test scores were not due to mental retardation. Instead, he reported that "cultural deprivation, alcohol abuse, [and] low average to borderline intellect" likely caused "Holsey's below average test scores and poor overall adjustment to life."[11]

---

[11] On the subject of causation, Dr. Cunningham testified that cultural deprivation is not inconsistent with mental retardation. He explained:

Mental retardation is independent of cause. And so whether or not your hardware was permanently stunted because you didn't get proper nurturance as a baby,

37

Testifying at deposition, he explained his opinion:

> He's neglected, he's abused, he drinks, he does poorly in school, he gets into trouble, he starts hanging out with the wrong people, and it's all pretty predictable. He doesn't get into lockstep with the mainstream.
>
> . . . .
>
> He never had the advantages of what most of us would have . . . . He was culturally deprived. He was psychologically deprived. He didn't have anything. He was a victim of his circumstances. He didn't have proper parenting. He didn't have proper food. He didn't have a proper education. He didn't have a father figure at all. He didn't have really anything.
>
> . . . .
>
> [H]e's essentially borderline to low average [in intellectual functioning]. If you throw into the equation alcohol abuse [beginning at an early age], his terrible conditions he grew up in, practically anyone would make a poor adjustment to life . . . .

In his written report, Dr. Einhorn noted other evidence that was inconsistent with a mental retardation diagnosis:

> Mr. Holsey's mother denied any delays of developmental milestones and these would be expected in true mental retardation. . . . [T]here is no history of special education placement. Despite his difficult childhood, he managed to learn basic skills that surpassed the expectancy of mentally retarded individuals. For example, in 1996, on the Wide Range Achievement Test[,] he obtained a <u>high school</u> level score in arithmetic . . . . This included the ability to calculate percentiles. This performance is well within normal limits. . . .

---

because you were neglected or abused or were impoverished or ate lead paint or were dropped on your head, whatever it is that compromised this hardware in a permanent way, all of that is called mental retardation.

> Additional contraindications of subnormal intelligence are seen in the transcripts of telephone calls to his sister, report of his playing poker, and his [sophisticated responses to disciplinary actions] while incarcerated.

Dr. Einhorn also highlighted that, as a Pizza Hut employee, Holsey was an "excellent" dishwasher although he was a poor pizza maker because he could not read ingredients, and that while in prison "he earned the level of trustee and was allowed to drive a truck." Dr. Einhorn pointed out that, in telephone conversations with Reeves, Holsey "used vocabulary that was well above a mentally retarded vocabulary." He also testified, "Mentally retarded people don't play poker or at least don't understand enough to play poker."[12]

### b. Dr. Shapiro

Holsey's collateral counsel submitted the deposition testimony of Dr.

---

[12] Dr. Cunningham criticized Dr. Einhorn's reliance on the purportedly contradictory evidence. For example, he testified that Dr. Einhorn should not have relied on Holsey's mother's statements that Holsey did not have delays in developmental milestones. First, according to Dr. Cunningham, the DSM-IV recognizes that mildly mentally retarded children may not have any developmental delays, and second, Holsey's mother is a poor source of information because she "is mildly mentally retarded or borderline intelligent herself." He also criticized reliance on the 1996 WRAT test, saying that test "was administered outside of the observation of the examiner" and that he was "surprised that Dr. Einhorn didn't bring a more critical analysis to bear as he would look at what is so obviously a grossly outlying score." Dr. Cunningham also thought that, although Holsey did use words in telephone conversations with his sister that were "a little surprising," Dr. Einhorn had placed too much emphasis on that fact. Finally, Dr. Cunningham disagreed with Dr. Einhorn's view that doing an excellent job washing dishes and being able to play poker were inconsistent with mental retardation, and said that view "suggests that Dr. Einhorn doesn't have a clear perception of what someone who's mildly mentally retarded is capable of and how they function."

Shapiro. He is a psychologist whom Holsey's trial lawyers had hired about two or three months before the trial to perform a general assessment, a general psychological assessment, and an assessment of Holsey's intellectual, academic, and emotional functioning, but had not called as a witness. Holsey's trial attorneys had given Dr. Shapiro only one document before he made those assessments—a two-page summary of Holsey's family history that they had prepared. In conducting his evaluation, Dr. Shapiro did not review "historical data concerning . . . Holsey from school records, [Youth Development Center] records, prison records, [or] prior mental health evaluations." (In his deposition, Dr. Shapiro testified that he had not needed those records because "[t]o some extent, [they're] irrelevant . . . [because] if someone's mentally retarded at the time you evaluate them, it's likely that they were mentally retarded as a child also.")

Dr. Shapiro met with Holsey for several hours at the Jasper County Jail on December 12, 1996, a little less than two months before the trial. During that interview, Holsey told him that (1) he had been raised by his mother and had grown up without a father figure; (2) he had "stayed in trouble" growing up; (3) he often ran away from home because he was bored and wanted to get out of his house; (4) he would "get a whoopin" whenever he got caught; (5) he regularly skipped school; and (6) when he was fourteen years old, he took a knife to school

one day because of "race riots" and found a white student and threatened him.

Holsey also told Dr. Shapiro that he had been in foster care because his mother "couldn't contain him," that police were called after he "got into a fight" with another foster child, and thereafter he was sent to the Youth Development Center.

After the interview, Dr. Shapiro administered some of the subtests of the Stanford-Binet Intelligence Scale to calculate Holsey's IQ. Dr. Shapiro explained that he had administered only some of the Stanford-Binet subtests because others were inappropriate given Holsey's age, and he had administered all of the subtests that were age-appropriate for Holsey. Using the results of those subtests, Dr. Shapiro determined that Holsey's IQ was 79.[13] He had also administered the Wide Range Achievement Test, which is scored on the same scale as an IQ test, and Holsey had scored a 93 on the math section. Dr. Shapiro testified at deposition that "it would not be possible or likely for a mentally retarded person to be able to achieve that score." He did state, though, that he "[p]ossibly" had not watched Holsey take the WRAT math section but instead had left the test with Holsey at

_____

[13] In his live testimony at the evidentiary hearing, Dr. Cunningham, one of Holsey's expert witnesses, criticized Dr. Shapiro's use of the Stanford-Binet Intelligence Scale test in 1996 to calculate Holsey's IQ. According to Dr. Cunningham, Dr. Shapiro should have given to Holsey thirteen subtests of the test instead of the six subtests that he actually gave. And even if giving the six subtests was appropriate, in Dr. Cunningham's view Dr. Shapiro had used the wrong standardization table in calculating Holsey's IQ as 79. If he had used the correct table, Dr. Cunningham believed, he would have come up with an IQ of 75.

the jail to be mailed back to him.[14]  Other testing done by Dr. Shapiro showed that Holsey was reading at a fourth-grade level.

Based on his evaluation, Dr. Shapiro was of the opinion that Holsey's intellectual functioning was in the borderline mentally retarded range.  Dr. Shapiro testified that he probably had told Prince about his impressions in "a very brief conversation," but he did not prepare a written report for Prince or Trammel, likely because neither attorney requested one.

Dr. Shapiro further testified that Holsey's state collateral counsel had provided him with two 3-inch, three-ring binders full of documents, which included Holsey's school and Youth Development Center records, scores from tests that others had administered, and affidavits from relatives and others who knew Holsey.  After reviewing those documents, Dr. Shaprio testified that he still believed that Holsey is not mentally retarded but instead is in "the borderline range."  Dr. Shapiro acknowledged that borderline intellectual functioning means a person is in approximately the bottom fifth percentile of intellectual functioning.

_____

[14] Dr. Shaprio testified that he did not recall how he got the WRAT math portion back from Holsey, but his usual practice was to "put the materials in the charge of the correction officer and ask that they make sure the defendant completes the materials and sends it back." Holsey's collateral counsel submitted the affidavit of Tanekia Kelly, a former detention officer at the Jasper County Jail.  She attested that she remembered Dr. Shapiro meeting with Holsey but that she did not remember Dr. Shapiro delivering any tests or paperwork to her that concerned Holsey.  No witness testified, however, that anyone had taken the test for Holsey, supplied him with any answers, or changed any answers that he gave.

42

Noting that the DSM-IV states that "the essential feature of antisocial personality disorder is a pervasive pattern of disregard for and violation of the rights of others that begins in childhood or early adolescence and continues into adulthood," the State asked Dr. Shapiro if Holsey suffers from antisocial personality disorder. Dr. Shapiro responded that he did not have enough information to answer that question. He did testify, however, that Holsey "had some conduct problems early on," including skipping school and running away from home, bringing a knife to school and putting it to another student's throat, getting in fights, and robbing a convenience store. In his opinion, Holsey's history of conduct problems would be "contributory to conduct disorder," which "[i]f it continues until adulthood and becomes a persistent pattern of behavior . . . [it becomes] part of his ingrained personality, and . . . is now his nature to be antisocial."

### c. Former Teachers

Holsey's collateral counsel submitted the affidavits of three of his former teachers: Sara Simcox, Annie Howard, and Thomas Lee. They attested that Holsey "wasn't a very good student"; displayed an "obvious slowness"; suffered serious intellectual limitations; could "barely read"; "just wasn't playing with a full deck"; and "didn't have any smarts going for him." Howard and Lee also

43

provided their impressions of Holsey's family. Howard attested in her affidavit that she "got the feeling that [Holsey's mother] didn't understand how serious [his] limitations were" and added that Holsey's sister Angela "was constantly having to be removed from the classroom." Lee provided similar information about Angela, telling the court that he had often seen her "in fistfights with grown men."

### d. Holsey's Family Members

Holsey's collateral counsel submitted deposition testimony and affidavits from Bertha Ingram, who is Holsey's mother's niece; and from Holsey's mother. Ingram told the court that Holsey's home "was always filthy and stunk with the smell of urine and rotting food"; that Holsey's mother favored her two youngest children and viciously beat Holsey and Angela. According to Ingram, their mother "would plug in a curling iron and whack their little hands with it once it got hot." She would also lash "them with extension cords, belts, a washer/dryer hose, cooking spoons or anything else she found handy." And while beating them, their mother would call Holsey and Angela "'buck teeth mother fucking monkeys'" and "'ugly ass bitches.'" She also told the court that Holsey's mother mocked his inability to read by sometimes putting a book in his hands and saying things like: "'Can you read any of the words in this book, boy?'"; "'What's wrong

44

with your head anyway?'"; and "'You're good for nothing just like your daddy was.'"

Holsey's mother admitted whipping her children as a form of punishment when they misbehaved, but she denied burning them with a curling iron or beating them with an extension cord or shoes. She also denied that the house was filthy.

Holsey's collateral counsel also submitted the affidavits of the following people: Rosa Ingram, Holsey's aunt; Sonya Parks, one of Holsey's cousins; Henry Holsey, Jr., another of Holsey's cousins; Linda Ingram, Holsey's mother's second cousin; Demetra Holsey, one of Holey's younger sisters; and Angela Holsey, one of his older sisters. They provided additional information about Holsey's limited intelligence and his troubled, abusive childhood.

Rosa Ingram attested in her affidavit that Holsey "definitely couldn't care for himself" and that he "needed a lot of guidance and supervision." Parks attested that she began living with her aunt, Holsey's mother, in the summer of 1980 and, during that time, Holsey's mother seemed uninterested in her son.

Henry Holsey, Jr. attested that Holsey "always used simple words, and kept to simple topics" and "learned things really slowly or not at all." He also noted that Angela, the sister, "was a fighter[;] [s]he would fight in a minute and she would fight anyone."

45

Linda Ingram attested that Holsey's mother "had very limited skills and simply couldn't cope with all the responsibilities of being a mother and providing for a family." She stated that she had once told a psychologist who was evaluating Holsey's mother that "she probably was mildly retarded seeing as how she has always depended on Regina, [Ingram], and . . . her younger daughter Lisa to manage a lot of basic things because she simply couldn't do them herself." Without explanation, Holsey's collateral counsel attached to Ingram's affidavit the psychologist's September 28, 2000 evaluation of Holsey's mother, which had concluded that she was mildly retarded.

Holsey's sister Demetra attested in her affidavit that she and her sister Lisa (who did not share the same father with Holsey, Reeves, and Angela) "were THE priority to" Holsey's mother: they "always had better clothes and toys" and they "got more food than the others did at meal times, too." Holsey's sister Angela's affidavit described growing up in their household. She said that their mother often "used all of her breath to embarrass and degrade [Holsey] . . . , especially in front of other people." She would call him a "'sissy boy' and tell him he was going to grow up to be one of the 'gals.'" According to Angela, she also "called [him] 'monkey' and 'crybaby' and yelled an endless stream of obscenities . . . ." Angela stated that their mother "would hit [them] for any reason or no reason." She said,

46

"[Holsey] and I were smacked with anything our mother could find, and it was brutal. We were hit all the time, usually with an electrical cord or watering hose . . . . If she had the curling iron close by, she'd plug it in and burn us with it."

### e. Former Girlfriends

Holsey's collateral counsel submitted the deposition testimony and affidavits of three of Holsey's former girlfriends: Mary Jackson, the girlfriend Holsey told to pick him up in a blue Jeep after he murdered Deputy Robinson while in a red car; Belinda Hawkins; and Louvenia Melchor. They provided information about Holsey's intelligence level. Jackson testified in her deposition that Holsey communicated better with her four-year-old son than he did with adults. Hawkins testified at deposition that Holsey was "responsible" but "had a mind like a child" and "felt like child's play was more important to him than, you know, being serious." And Melchor attested in her affidavit that she had broken up with Holsey because, in her view, he could not "handle the adult responsibilities of being in a serious relationship" and did not have "the smarts of a grown man."

### f. Friends and Neighbors

Collateral counsel submitted the affidavits of Donald Foster, Mary Havior, Catherine Harris, Essie Anderson, Sandra Francis, Joseph Trawick, and Bertha

Simmons.  All of them were Holsey's friends or neighbors.  Foster and Havior

provided information about Holsey's intelligence level.  Foster, a friend who had

known Holsey since they were teenagers, attested in his affidavit that Holsey "was

just slow in the head" and did not "have the smarts necessary to make his way on

his own."  Havior attested that Holsey had attended her church during the year

before he murdered Deputy Robinson, and she recounted how "he could not read

along in the hymn book and sing with the rest of the congregation."

Harris, Anderson, Francis, Trawick, and Simmons told the court about

physical abuse that Holsey suffered at the hands of his mother.  For example,

Harris, a long-time friend of Holsey's mother, attested in her affidavit that "it

didn't take anything more than a whim to come over [Holsey's mother] before . . .

. she'd have a belt or a curling iron in her hand and go to whacking [Holsey]."

And Anderson, who lived in Holsey's neighborhood during the 1970s and early

1980s, attested that Holsey's mother was "mean and cruel to her . . . kids" and

"[a]rmed with old shoes, belts, [or] extension cords . . . would wail on [Holsey]

until he had welts and abrasions all over his body."  She also described in her

affidavit how Holsey's home was "filthy and dirty with roaches, old garbage and

the stench of urine."

In her affidavit, Francis, who went to school with Holsey, provided more

48

details and referred to Holsey's home as "the Torture Chamber." Her affidavit stated that Holsey "regularly took beatings . . . in plain view and earshot of everyone else living" in the neighborhood. She attested that Holsey's mother often "dragged [him] by the arm out into their corner yard and went to lashing at him with an extension cord all the while cursing and yelling at the top of her lungs," calling him "vile" names like "butthole," "motherfucker," "sissy ass," "stupidhead," "dumbo," and "retardate." She remembered seeing Holsey "running for his life and not caring that he was covered in red welts and wounds."

### g. Coworkers

Holsey's collateral counsel submitted the affidavits of two former coworkers: Ferrlando Jones, who had testified at the sentencing phase of the trial, and Marion Wingate, who had not. Jones was the assistant manager of the Milledgeville Pizza Hut where Holsey had worked for a time, and in his affidavit, he stated that Holsey "came to work and tried his best every shift" but "was way behind most folks when it came to smarts." Wingate is a former supervisor at Seaboard Farms, a chicken processing company where Holsey worked in the early 1990s. He attested in his affidavit that none of the tasks the company assigned Holsey were hard or required much thinking.

h.  Others

Holsey's collateral counsel also submitted the affidavits of Kenneth Simmons, the man Holsey stabbed at the Soul Master's Lounge in 1992; and Scotty Simmons, Kenneth Simmons' brother.  Each of the Simmons brothers attested that Holsey had a rough childhood, with Scotty Simmons noting that Holsey's mother "used to tear into [Holsey] and beat him to a pulp when he was just a little kid."

They also submitted the affidavits of Hugh Tucker, Lelia Powell, and Susan Martin, all of whom attested to Holsey's intelligence level.  Tucker is a former supervisor at the Youth Development Center, and his affidavit stated that Holsey "was very limited intellectually"; "not capable of . . . abstract reflection"; "lacked the maturity, insight and sophistication typical of his peers"; and "used language like that of a child in grade school rather than what was expected of a fifteen year old."  Powell ran the Powell Attention Home, a home for children in need of special placement outside of their family homes, where Holsey stayed for several weeks in 1980.  In her affidavit, she described Holsey as "a slow, simple-minded boy who was way behind the other boys his age."  Martin is an investigator who worked for Holsey's trial lawyers during his trial, and she attested that, to her, Holsey "was a fairly slow and simple-minded young man."

50

### 3.  Department of Corrections Records

Holsey's collateral counsel also introduced into evidence his official

Georgia Department of Corrections records.  A February 1984 diagnostic summary

in those records reports that Holsey completed the ninth grade and scored within

the "dull normal range of general intelligence" on the department's Culture Fair

test.[15]  The summary notes that Holsey "does not appear to be in need of

specialized MH/MR treatment services . . . [although he] could benefit from

routine counseling services relating to development of internal controls over his

behavior, control of anger, and aggressive behaviors, and history of significant

substance abuse."  It also notes that Holsey's basic academic levels were too low

for him to be placed in vocational training.  A 1989 parole review summary, which

is in the same set of records, states that:  "Since his arrival [in prison] Holsey has

made a satisfactory adjustment.  He has an average performance rating and is

---

[15] Holsey also submitted the deposition testimony and affidavit of Dr. Herbert Eber, a psychologist who from 1974 until 1990 or 1991 "ran the processing part" of the Department of Corrections' diagnostic center.  In his affidavit, Dr. Eber stated that Holsey took a modified Culture Fair intelligence test in 1984 but that the results of that test "cannot be used as a measure of intelligence" to diagnose mental retardation.  He explained that the Department of Corrections does not employ a psychologist to administer the Culture Fair test, the test is not timed, the modified test does not take into account reading skills, and that "the norms used to evaluate the maximum potential IQ at the Georgia Diagnostic and Classification Center were not the norms produced by the [Culture Fair] test's publisher."  Instead, Dr. Eber had developed the norms using a research study of Georgia prisoners, and the test that Holsey was given had been revised "to better suit [the] purposes related to vocational and prison rehabilitation."

presently enrolled in school at 8.3 grade level."

Holsey's Department of Corrections records contain a 1985 disciplinary report from the Georgia Industrial Institute, where he was an inmate during the 1980s. According to that report, Holsey "jumped on" another inmate "because he said something about [Holsey's] gambling game." Holsey broke the inmate's front teeth, bloodied his nose, and gave him "several knots on his head." Another report in the records shows that in 1988 Holsey and another inmate "jumped on" Billy McGriff and Henry Lewis, injuring McGriff. That 1988 report states that "Holsey . . . like[s] to intimidate new inmates."[16]

The Department of Corrections records also contain a December 1992 offender profile report. That report states that Holsey potentially has an "Antisocial Personality" and that his "psychological profile suggests a very high risk for being assaultive and/or otherwise violent." It adds that Holsey "currently

---

[16] In an attempt to explain away those disciplinary reports, Holsey's collateral counsel submitted the affidavits of three people with whom Holsey had served time at the Georgia Industrial Institute: Billy McGriff, Rothman Lewis, and Henry Williams. McGriff attested in his affidavit that Holsey did not like to fight, which made him a target for prison thugs. Lewis attested in his affidavit that Holsey did not start fights in prison and did all he could to avoid fighting. He also said that Holsey had a "rough time of it in prison . . . because he was slow in the head." In his affidavit Williams attested that the Georgia Industrial Institute was a violent prison where an inmate was required to fight to protect himself. He did note that he himself had an altercation with Holsey at the prison, but said that it was "out of character" for Holsey.

is functioning in the average range of intelligence."[17]

### B. The State's Evidence

The State called two witnesses at the evidentiary hearing to testify about Holsey's level of intelligence—Dr. Thomas Sachy and Chief Deputy Sheriff Howard Sills—and it submitted the affidavits of eight others who had some knowledge about Holsey's intelligence. The State also introduced arrest records and an FBI identification record showing that Holsey had been arrested in 1982 for simple battery, in 1983 for theft by shoplifting, and in 1990 for carrying a concealed weapon.[18]

---

[17] The report does contain this apparently standard disclaimer:

THIS COMPUTER GENERATED REPORT SHOULD BE VIEWED WITH CAUTION. IT MAY NOT ACCURATELY DESCRIBE THIS OFFENDER. THESE STATEMENTS ARE BASED ON THE BEHAVIORS AND HISTORIES OF PERSONS WITH SIMILAR TEST SCORES, INTERVIEW RESPONSES, AND PERSONAL CHARACTERISTICS. THE DIAGNOSTIC AND TREATMENT SUGGESTIONS BELOW SHOULD BE CONSIDERED AS HYPOTHESES WHICH SHOULD BE CONFIRMED OR RULED OUT FOLLOWING EXAMINATION BY THE DIAGNOSTIC STAFF OR OTHER PERSONNEL.

[18] The State also submitted two affidavits from Julius Roberson. Roberson lived across the street from Holsey during the 1970s and early 1980s. In his first affidavit, which is dated March 28, 2002, Roberson attested that "[Holsey's mother] was outright violent toward [Holsey]" and that "[i]t was gut wrenching for me to see and hear how [she] treated [Holsey] . . . and know what incredible abuse they had to endure on an almost daily basis." He said that he often saw Holsey's mother whip "him with extension cords, old hoses, or thin branches." He also attested that Holsey was a "slow learner[]," "empty-headed," and "naive."

But in his second affidavit, dated August 20, 2003, Roberson contradicted much of what

## 1. The Witnesses

The State's first witness on the subject of Holsey's intelligence was Dr. Sachy, whom the court recognized as an expert in forensic psychiatry. He testified that the State had hired him to evaluate whether Holsey is mentally retarded. He told the court that in conducting his evaluation he had reviewed "the other psychologists' reports" and a variety of documents, including "many depositions and affidavits of family members and people who worked [with Holsey]" and Holsey's "school records, etc." He also personally interviewed Holsey.

Based on his evaluation, Dr. Sachy concluded that Holsey does not meet

---

he had attested to in his first affidavit. He explained that an investigator on Holsey's collateral legal team had interviewed him and months later returned to his house with a typed affidavit and read parts of it to him. In his second affidavit, Roberson attested that he felt like the investigator was rushing him, and he had signed that first affidavit without reading it himself. And Roberson explained that if the investigator had read all of that first affidavit to him, he would not have signed it. He stated that the first affidavit "contains many things that [he] did not say and several things that [he] told [the investigator] were not true." For example, he had never said that Holsey was a "slow learner[]"; "empty-headed"; or "naive." He also attested that Holsey's mother "was fair when she disciplined her kids," but in the first affidavit the investigator had tried to paint a "totally different" and inaccurate picture. And he stated that he had specifically told the investigator that he had never seen Holsey "whipped with branches, cords, and hoses."

As the Georgia Supreme court noted, "[t]he record is not developed on the issue of possible intentional misconduct" of the investigator or anyone on Holsey's legal team but we, like the Georgia Supreme Court, find the allegations contained in Roberson's second affidavit troubling. Holsey III, 642 S.E.2d at 61 n.2. Those allegations also illustrate the sometimes limited value of affidavits submitted by potential mitigation witnesses who did not testify in the trial or in the evidentiary hearing during the state collateral proceeding. We have observed before that affidavits submitted by habeas petitioners attacking their death sentences are sometimes "artfully drafted." Putman v. Head, 268 F.3d 1223, 1245 n.19 (11th Cir. 2001).

"the criteria for mental retardation." Instead, he has borderline intellectual functioning. Dr. Sachy performed a neurological evaluation on Holsey and found that he did not show any signs of neurological deficit. For example, Holsey did not have "the soft, physical signs of craniofacial abnormalities or other physical abnormalities consistent with mental retardation."

Dr. Sachy also based his conclusion that Holsey is not mentally retarded, in part, on testimony at the trial. For example, the evidence showed that on the night of the murder, Holsey had asked his girlfriend to pick him up in a blue Jeep instead of in her maroon car. The significance of that is that Holsey knew the police would be looking for a car that was red, the color of the getaway vehicle. He also told his girlfriend that he wanted to monitor a police scanner at his mother's house. Dr. Sachy testified that "[t]hose two points . . . are actually fairly sophisticated, cognitive patterns of someone who has forethought and intact levels of forethought that . . . would be beyond the range of someone with significant [or even mild] mental retardation." Dr. Sachy also found it important that in telephone conversations conducted while he was in prison, Holsey used "a lot of very high level, abstract words."[19]

---

[19] Dr. Cunningham, one of Holsey's expert witnesses who testified at the evidentiary hearing, criticized Dr. Sachy's conclusions. His stated that the absence of physical abnormalities is not inconsistent with a mild mental retardation diagnosis. He took the position that relying on

Dr. Sachy also testified that mental retardation indicators can overlap with symptoms of antisocial personality disorder. He explained:

> And they can be [easy to mix up], in the fact that someone may think someone with mental retardation is doing poor in school or they're not there at school or are they just slow, when in reality they have antisocial [personality disorder], they just don't fit in well. They don't enjoy school. They have a tendency to break the rules. And, really, they're on the road to . . . potential for later criminal activity. It can look the same initially . . . .

He testified that a history of fighting and committing aggravated assaults is more indicative of antisocial personality disorder than mental retardation. He explained that a history of "successful armed robberies or doing fairly well at them" is indicative of antisocial personality disorder and not mental retardation; successful armed robberies are "much more difficult for someone with real mental retardation."

The State also called as a witness at the evidentiary hearing Howard Sills, the former Chief Deputy Sheriff of Baldwin County and the officer who had arrested Holsey for Deputy Robinson's murder. Sills testified that he knew Holsey

someone's use of vocabulary is not an accepted way of diagnosing mental retardation. He also testified that, "Holsey is deficient when you systematically evaluate [him]. Now, the armchair kind of things that I may pull out, about an interaction with a girlfriend or about the criminal justice system, those are not a substitute nor do they negate the systematic measures that are undertaken." Although Dr. Cunningham did not otherwise address Dr. Sachy's reliance on Holsey's interaction with his girlfriend after he murdered Deputy Robinson, he did testify that there was nothing in Dr. Sachy's report that would cause him to change his opinion that Holsey is mentally retarded.

before the arrest because Holsey had been an inmate in the Baldwin County Jail. Based on his interaction with him, Holsey "was certainly not well educated, but [he] never detected anything that [he] would have personally noticed as being mental illness." Instead, Holsey "was conversant and articulate, for his education" and completed his jail chores satisfactorily.

## 2. The Affidavits

The State submitted the affidavits of seven current or former employees of the Baldwin County Sheriff's Office who knew Holsey from his time as an inmate at the county's jail: Jewel Hardage, Jerome Saulsbury, Carolyn Moss, Cathy Alexander, Sonia Harris, Betty Johnson, and Elbert Webb. In their affidavits, they attested that Holsey was "intelligent" and "ordinary," and he was an inmate who understood and followed instructions.

The State also submitted the affidavit of Evelyn Luton, the attorney who represented Holsey after he stabbed Kenneth Simmons and shot at Scotty Simmons in 1992. She attested that, although Holsey's "language was unpolished, there was no doubt in [her] mind after talking with him that he understood his situation and had no problems comprehending the choices available to him."

## C. The State Collateral Court's Decision

After the evidentiary hearing, the state collateral court concluded that

Holsey's trial lawyers had failed to properly prepare and present mitigating evidence of Holsey's limited intelligence and troubled, abusive childhood.  Holsey II, No. 2000-V-604, at 82.  The court also concluded that Holsey was prejudiced by that failure.  Id. at 80.  "In light of this lack of any significant preparation or presentation" of mitigating evidence, the court reasoned, "no one can seriously believe that [Holsey] received the constitutional guarantees of the Sixth Amendment right to effective assistance of counsel."  Id. at 83–84.  For that reason, the court granted a writ of habeas corpus with respect to Holsey's death sentence, vacating that sentence and ordering that Holsey receive a new trial of the sentencing phase only.  Id. at 84.

## D.  The Appeal

The State appealed the state collateral court's grant of habeas relief.  The Geogia Supreme Court unanimously reversed that grant and reinstated Holsey's death sentence.  Holsey III, 642 S.E.2d at 59.  The court did "accept, for the purposes of this analysis," that Holsey had shown that his trial lawyers had performed deficiently by not properly preparing and presenting mitigating evidence of his limited intelligence and troubled, abusive childhood.  Id. at 62.  The court nonetheless concluded that Holsey had failed to show prejudice, "that 'there is a reasonable probability . . . that, but for counsel's unprofessional errors,

the result of the proceeding would have been different.'" Id. at 60 (quoting Smith

v. Francis, 325 S.E.2d 362, 363 (Ga. 1985)).

The Georgia Supreme Court explained its conclusion that Holsey's had

failed to show a reasonable probability of a different result despite the witnesses,

affidavits, and documents his collateral counsel presented in the evidentiary

hearing:

> The additional evidence Holsey has presented in his habeas
> proceedings, some of it contradicted by the [State's] evidence, is
> largely cumulative of evidence presented at trial, which highlighted
> Holsey's limited intelligence, his troubled and abusive home life, his
> positive contributions at home and elsewhere, and his mother's and
> sister's mental health issues.  Having reviewed both the habeas record
> and the trial record, including the trial testimony of two of Holsey's
> sisters and of other witnesses, the trial deposition testimony of
> Clifford Holsey, Jr., and the non-testimonial material entered into
> evidence at trial, this Court concludes that introduction of Holsey's
> new evidence at his trial would not have had an impact on the jury's
> sentencing deliberations sufficient to help sustain a successful
> ineffective assistance of counsel claim regarding the sentencing
> phase.

Id. at 61–62 (citation omitted).

## III.  THE DISTRICT COURT'S DECISION

After the Georgia Supreme Court reversed the state collateral court's grant

of habeas relief, Holsey filed a 28 U.S.C. § 2254 petition for a writ of habeas

corpus.  He raised ten claims, including the only one at issue in this appeal:  that

his trial lawyers rendered ineffective assistance at the sentencing phase by not presenting enough mitigating circumstances evidence about his limited intelligence and troubled, abusive childhood.

The district court denied the petition. Holsey IV, No: 3:07-cv-129(CDL), at 27. In doing so, it concluded that the Georgia Supreme Court had not unreasonably determined that the additional mitigating circumstances evidence Holsey's collateral counsel presented in the state court's evidentiary hearing was largely cumulative of the evidence Holsey's trial lawyers presented at the sentencing phase. Id. at 23. The court reasoned that Holsey's trial lawyers "did, during the sentencing portion of the trial, present evidence of [his] limited intelligence, his abusive home life, his positive contributions to his sisters, and his sister and mother's mental health problems." Id. Also, relying on the largely cumulative nature of the additional mitigating circumstances evidence, much of which it found had been contradicted by the State's evidence, the district court concluded that the Georgia Supreme Court's decision that Holsey had not shown prejudice was not an unreasonable application of clearly established federal law. Id. at 25–27.

## IV. DISCUSSION

Holsey contends that the district court erred in denying his 28 U.S.C. § 2254

habeas corpus petition and should have ruled that his trial lawyers' performance at the sentencing phase was ineffective under Strickland v. Washington, 466 U.S. 688, 104 S.Ct. 2052 (1984). He argues that those lawyers did not properly prepare and present enough available mitigating evidence about his limited intelligence and his troubled, abusive childhood and that, if they had done so, his sentence would have been different. In reviewing a district court's denial of a § 2254 habeas petition, we review only for clear error the court's factfindings but review de novo the court's application of the law to those facts. Johnson v. Sec'y, Dep't of Corr., 643 F.3d 907, 929 (11th Cir. 2011).

To succeed on his ineffective assistance of counsel claim, Holsey has the burden of showing two things under Strickland. Id. at 928. First, he must show that his counsel's performance was deficient, which means that it "fell below an objective standard of reasonableness" and was "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 688, 690, 104 S.Ct. at 2064, 2066; accord Johnson, 643 F.3d at 928; Allen v. Sec'y, Fla. Dep't of Corr., 611 F.3d 740, 751 (11th Cir. 2010); Smith v. Sec'y, Dep't of Corr., 572 F.3d 1327, 1349 (11th Cir. 2009). Courts must review counsel's actions in a "highly deferential" manner and "must indulge a strong presumption that counsel's conduct" was reasonable. Strickland, 466 U.S. at 689, 104 S.Ct. at

61

2065. To overcome that strong presumption of reasonableness, Holsey must show that "'no competent counsel would have taken the action that his counsel did take.'" Johnson, 643 F.3d at 928 (quoting Chandler v. United States, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc)).

The second thing that Holsey must show is that he was prejudiced by his counsel's deficient performance, which means "that, but for his counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different." Id. (citing Strickland, 466 U.S. at 694, 104 S.Ct. at 2068). To find that there is a reasonable probability of a different result "our confidence in the outcome must be undermined by counsel's deficient performance." Id. at 929 (citing Strickland, 466 U.S. at 694, 104 S.Ct. at 2068).

In addition to the Strickland two-step showing, Holsey's ineffective assistance of counsel claim is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996. See 28 U.S.C. § 2254(d). Under AEDPA, a federal court may not grant a petitioner habeas relief on any claim that was "adjudicated on the merits" in state court unless the state court's decision was: "(1) . . . contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) . . . was based on an unreasonable determination of the facts in light

of the evidence presented in the State court proceeding." Id.; accord Johnson, 643 F.3d at 929; Allen, 611 F.3d at 744–45; Hammond v. Hall, 586 F.3d 1289, 1306 (11th Cir. 2009). A state court's application of clearly established federal law or its determination of the facts is unreasonable only if no "fairminded jurist" could agree with the state court's determination or conclusion. Harrington v. Richter, — U.S. —, 131 S.Ct. 770, 786 (2011); accord Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140, 2149 (2004). In our en banc decision in Hill we phrased this standard "more simply and maybe a little more clearly: if some fairminded jurists could agree with the state court's decision, although others might disagree, federal habeas relief must be denied." 662 F.3d at 1346; accord Sochor v. Sec'y Dep't of Corr., 685 F.3d 1016, 1028 (11th Cir. 2012) ("In other words, we may issue a writ of habeas corpus only where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with precedents of the Supreme Court of the United States." (quotation marks and alterations omitted)).

AEDPA does not impose a complete bar on the relitigation in federal court of claims already rejected in state proceedings. Harrington, 131 S.Ct. at 786; accord Hill, 662 F.3d at 1345. Instead, "[i]t preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with th[e] Court's precedents. It goes no farther."

63

Harrington, 131 S.Ct. at 786.  As the Supreme Court has emphasized:

> Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal.  Jackson v. Virginia, 443 U.S. 307, 332, n.5, 99 S.Ct. 2781, 2796 n.5 (1979) (Stevens, J., concurring in judgment).  As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

Id. at 786–87.

"If this standard is difficult to meet, that is because it was meant to be."  Id. at 786.  It was designed to be difficult in order "to ensure that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism."  Martinez v. Ryan, — U.S. —, 132 S.Ct. 1309, 1316 (2012).  The Supreme Court gave this explanation:

> Federal habeas review of state convictions frustrates both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights.  It disturbs the State's significant interest in repose for concluded litigation, denies society the right to punish some admitted offenders, and intrudes on state sovereignty to a degree matched by few exercises of federal judicial authority.

Harrington, 131 S.Ct. at 787 (citation and quotation marks omitted); accord Calderon v. Thompson, 523 U.S. 538, 555–56, 118 S.Ct. 1489, 1500–01 (1998).

For those reasons, "it will be a rare case in which an ineffective assistance of

64

counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding." Johnson, 643 F.3d at 910–11.

A.

Because the Georgia Supreme Court denied Holsey's ineffective assistance of counsel claim based on Strickland's prejudice step, we review with ADEPA deference its holding that Holsey was not prejudiced by his trial lawyers' alleged deficiencies at the sentencing phase. See Kokal v. Sec'y, Dep't of Corr., 623 F.3d 1331, 1345–46 (11th Cir. 2010). Like the Georgia Supreme Court, we will assume for present purposes that Holsey's trial lawyers rendered deficient performance within the meaning of Strickland in regard to the sentencing phase. We will also assume that an attorney rendering constitutionally effective performance would have presented at the sentencing phase the evidence that Holsey's trial lawyers actually did present at that phase plus all of the additional evidence that his collateral counsel submitted in the state collateral court.

Those two assumptions do not affect the outcome of this case because Holsey has not shown that the Georgia Supreme Court's holding that he was not prejudiced by his counsel's assumed deficient performance was based on an unreasonable determination of the facts or is an unreasonable application of clearly established federal law. Holsey has not shown that no fairminded jurist

65

could have concluded, as all seven Justices of the Georgia Supreme Court did, that he has failed to carry his burden of showing that if the additional evidence had been presented there is a reasonable probability of a different sentencing result. Holsey has not shown that the evidence on the prejudice question is so one-sided in his favor that the answer is, as the Supreme Court has phrased it, "beyond any possibility for fairminded disagreement." Harrington, 131 S.Ct. at 787. He has not shown that the Georgia Supreme Court's determination of the prejudice issue was so unjustified that it "was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 786–87; accord Bobby v. Dixon, — U.S. —, 132 S.Ct. 26, 27 (2011) (per curiam).

B.

Holsey's first contention is that the Georgia Supreme Court's holding that he did not show prejudice was based on an unreasonable determination of the facts. See Appellant Br. 18–28. He argues that it was objectively unreasonable for the court to characterize the evidence of his limited intelligence and troubled, abusive childhood that he presented in the state collateral court as "cumulative" of the evidence he presented at the sentencing phase. Appellant Br. 18. About his limited intelligence, he argues that the jury at the sentencing phase "merely hear[d] an undefined label like 'borderline mentally retarded,'" but the evidence presented

66

at the evidentiary hearing actually explained the deficits that he faced and provided "qualitatively superior information about [his] . . . mental capacities." Appellant Br. 24. About his troubled, abusive childhood, he argues that the jury at the sentencing phase did not hear sufficient "detail about his upbringing." Appellant Br. 22.

Holsey mischaracterizes the conclusion of the Georgia Supreme Court. The court did not describe the evidentiary hearing evidence as "cumulative" of the evidence presented at the sentencing phase but instead characterized it as "largely cumulative." See Holsey III, 642 S.E.2d at 61–62. There is a difference. "Cumulative" may mean "completely cumulative" or it may not, but "largely cumulative" does not mean "cumulative." Instead "largely cumulative" means "chiefly cumulative," "mostly cumulative," or "more cumulative than not." See Random House Webster's Unabridged Dictionary 1084 (2d ed. 2001); cf. Lanfear v. Home Depot, Inc., 679 F.3d 1267, 1277 (11th Cir. 2012) ("Primarily does not mean exclusively; primarily exclusively means primarily.").

We have some serious doubt about treating as a factfinding to be reviewed under 28 U.S.C. § 2254(d)(2) the Georgia Supreme Court's conclusion that the additional evidence at the evidentiary hearing was "largely cumulative" of the evidence presented at the sentencing phase. The "largely cumulative" conclusion

does not seem to be a factfinding or a "determination of the facts" that is subject to review under that statutory provision; it seems to be a conclusion in the nature of an application of law to fact. At the very least, it is not a finding or determination of the historical facts of the case. See Am. Civil Liberties Union of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd., 557 F.3d 1177, 1206 (11th Cir. 2009) (explaining that historical facts are the "who, what, where, when, and how of the controversy"). Instead, the term "largely cumulative" seems more of a way of conveying that there was not enough of a difference between the evidence presented during the sentencing phase and the evidence presented in the collateral evidentiary hearing to establish a reasonable probability of a different result.

In Cooper v. Secretary, Department of Corrections, 646 F.3d 1328, 1349 (11th Cir. 2011), however, we did state that the Florida Supreme Court's conclusion that the petitioner's collateral hearing evidence in that case was "cumulative to that presented at sentencing" was an unreasonable determination of the facts under § 2254(d)(2). Cooper, though, appears to be an outlier. We could not find any other decision where we have analyzed a state court's conclusion about the cumulative nature of evidence as a determination of the facts under § 2254(d)(2). Our "unreasonable determination of the facts" analysis in cases other than Cooper has involved determinations of historical facts. See, e.g., Rhode v.

68

Hall, 582 F.3d 1273, 1282–83 (11th Cir. 2009) (reviewing under § 2254(d)(2) whether counsel was personally involved in the investigation of mitigation evidence); Carroll v. Sec'y, Dep't of Corr., 574 F.3d 1354, 1368–69 (11th Cir. 2009) (reviewing under § 2254(d)(2) whether the defendant was mentally retarded); Whisenhant v. Allen, 556 F.3d 1198, 1208 (11th Cir. 2009) (reviewing under § 2254(d)(2) whether a judge knew that a motion was not properly served).

Our Cooper decision also appears to conflict with the Supreme Court's decision in Cullen v. Pinholster, — U.S. —, 131 S.Ct. 1388 (2011). In Cullen the Supreme Court held that the petitioner had not shown that the state supreme court unreasonably applied clearly established federal law, in part, because the Supreme Court decided that the additional mitigation evidence in the state habeas proceedings "largely duplicated the mitigation evidence at trial." Id. at 1409. The Supreme Court decided for itself that the additional evidence presented in the state collateral proceeding "largely duplicated" the evidence that had been presented at trial. Because federal appellate courts, including the Supreme Court, are not factfinders, see Pullman-Standard v. Swint, 456 U.S. 273, 291–93, 102 S.Ct. 1781, 1791–92 (1982); United States v. Noriega, 676 F.3d 1252, 1263 (11th Cir. 2012); United States v. Fulford, 662 F.3d 1174, 1181 (11th Cir. 2011), the Supreme Court's "largely duplicated" determination in Cullen is not a factfinding; if it

69

were, the Supreme Court would not have made it because appellate courts do not make factfindings. So, Cullen indicates that this Court in Cooper should not have treated the "cumulative" determination as a factfinding and that the Georgia Supreme Court's "largely cumulative" determination in this case probably is not a factfinding.[20]

Nonetheless, the State in this case does not contend that we should not treat that determination as a factfinding for purposes of § 2254(d)(2), and doing so does not affect the result. So we will assume, as Holsey argues, that the determination was one of fact subject to review under § 2254(d)(2).[21] We will not, however, be deciding whether it would have been reasonable to find that the additional collateral hearing evidence was "cumulative" of the trial and sentencing phase evidence because that is not what the Georgia Supreme Court said. It said "largely

[20] The dissenting opinion misconstrues our statements about the Cullen decision. See Dissenting Op. 120 n.5. We are not saying that § 2254(d)(2) applies only to a subset of factfindings. Instead, we are pointing out that the Supreme Court and this Court have held that federal appellate courts, of which the Supreme Court is one, do not find facts. It follows that when the Supreme Court determined in Cullen that the evidence presented in the state collateral proceeding "largely duplicated" the evidence at the sentence proceeding, the Court was not finding facts but applying law to fact. And because the Supreme Court's "largely duplicated" determination in Cullen was an application of law to fact, it follows that the Georgia Supreme Court's "largely cumulative" determination in this case was also an application of law to fact. It is as simple as that.

[21] The dissenting opinion falsely accuses us of disregarding the Cooper decision. See Dissenting Op. 118. While we believe that decision is wrong on the question of whether "cumulative" is a factfinding or an application of law to fact, we treat it as correct and binding and explain why this case is distinguishable. See infra pp. 88–89.

70

cumulative," and we will review for reasonableness that determination, not Holsey's pruned down revision of it.

C.

As the Supreme Court has observed, "[t]he term 'unreasonable' is no doubt difficult to define." Wood v. Allen, — U.S. —, 130 S.Ct. 841, 849 (2010). Despite that difficulty, the Court has explained "that a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." Id. Instead, "if some fairminded jurists could agree with the state court's decision, although others might disagree," the state court's decision is not unreasonable. Hill, 662 F.3d at 1346. To be unreasonable, the error in the state court's finding must be so clear that there is no possibility for "fairminded disagreement." Harrington, 131 S.Ct. at 786–87. AEDPA "demands that state-court decisions be given the benefit of the doubt." Renico v. Lett, — U.S. —, 130 S.Ct. 1855, 1862 (2010) (quotation marks omitted); accord Morton v. Sec'y, Fla. Dep't of Corr, — F.3d —, No. 11–11199, 2012 WL 2332758, slip op. at 14–15 (11th Cir. June 20, 2012).

To determine whether the Georgia Supreme Court's "largely cumulative" determination was an unreasonable one, we compare the trial evidence with the evidence presented during the state postconviction proceedings. In doing so, we

71

keep in mind that the United States Supreme Court, this Court, and other circuit courts of appeals generally hold that evidence presented in postconviction proceedings is "cumulative" or "largely cumulative" to or "duplicative" of that presented at trial when it tells a more detailed version of the same story told at trial or provides more or better examples or amplifies the themes presented to the jury. See, e.g., Cullen, 131 S.Ct. at 1409–10 ("The 'new' evidence largely duplicated the mitigation evidence at trial. School and medical records basically substantiate the testimony of [the petitioner]'s mother and brother. Declarations from [the petitioner]'s siblings support his mother's testimony that his stepfather was abusive and explain that [the petitioner] was beaten with fists, belts, and even wooden boards." (emphases added)); Wong v. Belmontes, 558 U.S. 15, 130 S.Ct. 383, 387–88, (2009) (per curiam) (holding that "[s]ome of the [additional mitigating] evidence was merely cumulative of the humanizing evidence [the petitioner] actually presented" because "[t]he sentencing jury was . . . well acquainted with [the petitioner's] background and potential humanizing features" (quotation marks omitted)); Boyd v. Allen, 592 F.3d 1274, 1297–98 (11th Cir. 2010) (finding that much of the evidence presented by the petitioner during postconviction proceedings "was in some measure cumulative" of the trial evidence because "much (although not all) of the 'new' testimony introduced at

72

the post-conviction hearing would simply have amplified the themes already raised at trial" (emphasis added)); Rhode, 582 F.3d at 1287 ("At best, the evidence would have been cumulative, providing more information about [the petitioner]'s bad childhood and early exposure to drugs and alcohol." (emphasis added)); Robinson v. Moore, 300 F.3d 1320, 1347 (11th Cir. 2002) ("[M]ost of the new mitigation evidence is cumulative of the nonstatutory mitigating circumstances presented during resentencing. . . . While the additional mitigation witnesses procured by [the petitioner's habeas] counsel could have presented the resentencing jury and trial judge with more details, or different examples, of these aspects of [the petitioner's] life, these aspects of his life were nonetheless known to the resentencing jury and trial judge." (emphases added)); Riley v. Wainwright, 778 F.2d 1544, 1549–51, 1551 n.14 (11th Cir. 1985) (describing as "largely cumulative" the forensic evidence that the petitioner claimed should have been presented at sentencing because that forensic evidence would have only "buttress[ed]" the points made by other witnesses); Jackson v. Bradshaw, 681 F.3d 753, 769–70 (6th Cir. 2012) (holding that evidence presented during collateral proceedings was "largely cumulative" of evidence presented during sentencing because the collateral evidence provided only a "larger pool of information of the same type already offered" at sentencing); Beuke v. Houk, 537 F.3d 618, 645–46

73

(6th Cir. 2008) (holding that the petitioner's collateral evidence was "largely cumulative" of the evidence presented at trial because it concerned the same "subject matter [as] the evidence actually presented at sentencing"); Paul v. United States, 534 F.3d 832, 842–43 (8th Cir. 2008) (holding that "[m]uch of the new [collateral] evidence cited by [the petitioner] [was] largely cumulative of evidence that was presented . . . at the penalty phase of the trial" although the collateral evidence might have provided "more detail about [the petitioner]'s difficult and abusive childhood or his compassionate character"); Buckner v. Polk, 453 F.3d 195, 207 (4th Cir. 2006) ("To the extent that the Maxwell and Coleman affidavits provide new detail of the stories of [the petitioner]'s brother's death and his father's alcoholism, we conclude that this new detail is largely cumulative."); Hedrick v. True, 443 F.3d 342, 353 (4th Cir. 2006) ("The evidence that [the defendant] had received low scores on intelligence tests administered at an early age is largely cumulative of testimony from Dr. Hawk and [the defendant]'s mother during the sentencing phase that he had learning troubles in his youth . . . ."); Baldwin v. Maggio, 704 F.2d 1325, 1334 (5th Cir. 1983) (holding that a petitioner was not prejudiced by his counsel's failure to present "largely cumulative" evidence from several witnesses because "[t]heir testimony would have served only to corroborate the portrait of the man sketched by" other

74

witnesses who had testified at sentencing).

The evidence presented at the sentencing phase of Holsey's trial and during the collateral evidentiary hearing all goes to one of two chapters of his mitigating circumstances story. One chapter is about his limited intelligence and the other is about his troubled, abusive childhood growing up poor in a home with an absentee father, a mentally challenged, abusive mother, and a violent, mentally challenged sister. Holsey contends, however, that in the state collateral court he told a more detailed version of both those chapters of his story than his trial lawyers told at the sentencing phase of his trial. He argues that those additional details render the Georgia Supreme Court's "largely cumulative" conclusion unreasonable. We will compare the chapters separately, turning first to a comparison between the sentencing phase and state collateral court evidence about Holsey's limited intelligence, and then to a comparison of the evidence about his troubled upbringing.

1.

At the sentencing phase, Holsey's trial lawyers informed the jury that he is a man of limited intelligence. They told that story primarily through the testimony of Holsey's sister Regina Reeves who was a Deputy United States Marshal. She testified that Holsey performed poorly in school, and was usually assigned to the

75

next grade level instead of actually passing into that grade level, and he dropped out of school before finishing the tenth grade. The jury learned from his school records, which Reeves read to them, that Holsey was "a weak student" and "very slow" and a "poor worker" who "need[ed] help from home" but never got that help. Reeves also read to the jury part of Holsey's Youth Development Center records, which said that Holsey "functions in the borderline mental retardation range of intelligence," and she told the jury that another part of those records described how a then fifteen-year-old Holsey was functioning academically at only a third-grade level. Also, one of Holsey's trial lawyers told the jury in her closing statement that Holsey is "borderline mentally retarded," a point she reiterated by telling the jury that he "was just assigned [to grades] for school."

In the state postconviction proceedings, Holsey presented additional evidence that told a more detailed version of the limited-intelligence story that his trial lawyers had put before the jury in the sentencing phase. Holsey called two psychologists to testify at the evidentiary hearing: Dr. Cunningham and Dr. Toomer. Each psychologist testified that in his opinion Holsey is mildly mentally retarded, which means he suffers from what Dr. Cunningham described as a "catastrophic disability," although the DSM-IV does not describe it that way, see supra p. 29 n.7. Holsey also submitted the deposition testimony of two other

76

psychologists—Dr. Einhorn, whom the State had hired to evaluate Holsey, and Dr. Shapiro who had been hired by Holsey's trial lawyers before the trial. Those two experts testified that Holsey is not mentally retarded but instead functions in the borderline mental retardation range, which is what the jury had heard during the sentencing phase. Dr. Shaprio added in his deposition testimony that someone in the borderline mental retardation range is in approximately the bottom fifth percentile of intelligence. (During its presentation at the same hearing the State called as an expert witness Dr. Sachy, a psychiatrist, who agreed with Dr. Einhorn and Dr. Shaprio that Holsey is not mentally retarded but instead functions in the borderline mental retardation range.)

In the state collateral proceedings, Holsey also submitted the deposition testimony and affidavits of several witnesses who testified or attested that Holsey has limited intelligence. Three of Holsey's former teachers explained that he "wasn't a very good student"; displayed an "obvious slowness"; suffered serious intellectual limitations; could "barely read"; "just wasn't playing with a full deck"; and "didn't have any smarts going for him." Family members explained that he "definitely couldn't care for himself"; "needed a lot of guidance and supervision"; "learned things really slowly or not at all"; and was not very smart. Holsey's friends and former neighbors told the state collateral court that he "was just slow

in the head"; did not "have the smarts necessary to make his way on his own"; and did not have "the smarts of a grown man." One of Holsey's former coworkers told the court that "he was way behind most folks when it came to smarts." Others said that he "was very limited intellectually"; "not capable of abstract reflection"; and was "a slow, simple-minded boy."[22]

(We will save for later a discussion of the contrary evidence in the form of lay testimony that the State presented at the evidentiary hearing on the question of Holsey's intelligence. See infra p. 99 n.24.)

As our comparison shows, the limited-intelligence evidence that Holsey presented during the state postconviction proceedings concerned the same "subject matter [as] the evidence actually presented at sentencing," Beuke, 537 F.3d at 645–46, and primarily was a more detailed retelling of the limited-intelligence story his trial lawyers told the jury at the sentencing phase. Most of that additional evidence "basically substantiate[d]" or "support[ed]" the testimony of Reeves and the facts in the records put before the jury while she was testifying about Holsey not being intelligent, performing poorly in school, and functioning in the

---

[22] To contradict those depositions and affidavits, at the state postconviction evidentiary hearing, the State called Howard Sills, the former Chief Deputy Sheriff Baldwin County, and submitted the affidavits of eight others. Sills' testimony and the affidavits described Holsey as an ordinary, intelligent person.

borderline mentally retarded range.  See Cullen, 131 S.Ct. at 1435.  In other words, the evidence presented in the state collateral court provided a "larger pool of information of the same type already offered," Bradshaw, 681 F.3d at 770, and merely "amplified the themes [of]" his sentencing phase evidence, Boyd, 592 F.3d at 1298, by expanding on and providing more details and different examples about his limited intelligence, see Robinson, 300 F.3d at 1347.  For that reason, a reasonable jurist could determine, as the Georgia Supreme Court did, that the additional evidence about Holsey's limited intelligence was "largely cumulative" of the evidence presented at trial.

The state collateral court did hear some evidence about Holsey's limited intelligence that may not have been cumulative, specifically the testimony of two psychologists who diagnosed him as mildly mentally retarded and Dr. Shapiro's explanation of borderline mental retardation.  That some of the limited-intelligence evidence presented in the state collateral court was not cumulative does not mean that the Georgia Supreme Court's conclusion that the state collateral limited-intelligence evidence was "largely cumulative" was an unreasonable determination of the facts.  It wasn't unreasonable.  As we have just described, most of the evidence presented about limited intelligence in the state collateral court was cumulative of the evidence presented at trial.  And "mostly" is

79

"largely." See Roget's Super Thesaurus 339 (4th ed. 2010) (stating that "mostly" is a synonym for "largely").

Our decision in Herring v. Secretary, Department of Corrections, 397 F.3d 1338 (11th Cir. 2005), is instructive. In Herring, the petitioner argued, among other things, that his trial counsel was deficient and he was prejudiced because his counsel did not "introduce two psychological reports that diagnosed him as suffering from retardation and other organic neurological disorders." Id. at 1351. We held that the petitioner had not shown prejudice because, among other things, the reports were "cumulative" of the petitioner's mother's trial testimony that he had a low IQ and a learning disability. Id. Similar to the jury in Herring, the jury at the sentencing phase in this case heard that Holsey has limited intelligence, functions in the borderline mental retardation range, and performed poorly in school. Some expert testimony diagnosing Holsey with mild mental retardation (contradicted by other expert testimony that he is not mentally retarded) or explaining the term "borderline mental retardation" does not alter the cumulative nature of the rest of the additional evidence about Holsey's limited intelligence.

2.

We now turn to a comparison of the evidence at the sentencing phase and state collateral hearing concerning Holsey's troubled, abusive childhood. At the

sentencing phase, the jury heard about Holsey's troubled, abusive childhood from both Clifford Holsey and Regina Reeves and from Holsey's Youth Development Center records. Clifford told the jury that (1) Holsey grew up in a "rough" home that was infested with cockroaches; (2) Holsey's mother neglected, abused, and "walked all over" him; (3) Holsey's mother would curse at, "scold[,] and . . . beat" her son; and (4) she often left her children alone at night because she worked nights at Clifford's club.

Holsey's sister, Reeves, testified about his troubled, abusive childhood. She told the jury that "things were horrible" for Holsey growing up. She recounted that their mother often beat her three oldest children—Reeves, Angela, and Holsey—which motivated Reeves to escape from their mother's cruelty by leaving home at age seventeen. Reeves also read to the jury part of Holsey's Youth Development Center records stating that Holsey "has no supervision at home." She further explained that their mother was often absent and had once been hospitalized for psychiatric issues and that Holsey never really knew their father. Holsey, she said, "more or less" grew up on the streets. She also told the jury about how Angela, who was a major influence on Holsey, was a violent person who had been hospitalized several times for mental issues.

A summary of a Youth Development Center home evaluation, which was

81

contained in the records that were put into evidence at the sentencing phase, informed the jury that Holsey's mother "ha[d] no idea how to control [him] without resorting to excessive punishment." In her closing statement, one of Holsey's trial lawyers highlighted Holsey's troubled, abusive "home life," noting that he "grew up by himself." She told that jury that he "had nothing that every child deserves to have. He was deprived of everything."

In the state evidentiary hearing, Holsey's collateral counsel presented evidence that provided the court with more details about Holsey's troubled, abusive childhood than the jury had heard at the sentencing phase. Reeves testified in more detail about the verbal, emotional, and physical abuse Holsey had suffered while growing up. She told the court that Holsey had grown up in a "horrible" economic situation and that he did not always have enough to eat. She said that their mother was rarely home because she worked day and night, and when she was home she favored his two younger sisters over Holsey, Reeves, and Angela.

Reeves provided details about how their mother verbally and physically abused Holsey. She testified that their mother would curse at and humiliate him, telling him that "he was just like his no-good-ass daddy" and that "he was going to be a punk and a sissy." Their mother also told Holsey that he had a "can't talk

ass" and that he could not "talk worth a shit." Reeves provided the state collateral court with examples of the physical abuse Holsey suffered, telling the court that their mother would beat him with an extension cord, shoes, and a broom and would sometimes hold his head under the bathtub faucet. Reeves also said that their mother would beat Holsey because he wet the bed until he was thirteen years old and that Holsey had once seen his mother beat Angela until she was unconscious.

Holsey's collateral counsel also submitted depositions and affidavits that provided more details about his troubled, abusive childhood. Family members, friends, and neighbors told how his mother verbally abused him, calling him things like a "buck teeth mother fucking monkey[]"; a "'sissy boy'"; and a "'cry baby.'" They also told the court that his mother made fun of his limited intelligence, saying things like: "Can you read any of the words in this book boy?" and "'What's wrong with your head anyway." She also would call him a "motherfucker," "sissy ass," "stupidhead," "dumbo," and "retardate." Holsey's sister Demetra told the court that his mother made distinctions between her children, treating her two youngest daughters the best.

Family, friends, and neighbors described the severity of the abuse Holsey suffered at the hands of his mother. A former neighbor told the court that his

mother was "mean and cruel to her . . . kids," and others told the court that his mother would beat him for any reason or no reason at all. According to the depositions and affidavits, "while cursing and yelling at the top of her lungs," she repeatedly unleashed "brutal" beatings on him, using extension cords, belts, a washer/dryer hose, shoes, a hot curling iron, or "anything else she found handy." During these violent outbursts, Holsey's mother would "tear into [him] and beat him to a pulp." A friend even recounted that she had seen Holsey "running for his life and not caring that he was covered in red welts and wounds."

Others told the court that Holsey's childhood home was disgusting. His mother's niece said that it "was always filthy and stunk with the smell of urine and rotting food," and a former neighbor said his home was "filthy and dirty with roaches, old garbage and the stench of urine."

As this comparison of the evidence presented at the sentencing phase and at state collateral court's evidentiary hearing shows, the state collateral court was not the first court to hear about Holsey's troubled, abusive childhood. Although the court heard more details about that childhood during the evidentiary hearing, the jury at the sentencing had heard about his troubled, abusive upbringing too. Like the evidence Holsey presented in the evidentiary hearing about his limited intelligence, the evidence he presented during the hearing about his troubled,

abusive childhood "basically substantiate[ed]" and "support[ed]" the story that Holsey's trial lawyers had put before the jury about how he grew up poor in a filthy home, with a mentally challenged, absentee mother who, when she was around, beat him and verbally abused him. See Cullen, 131 S.Ct. at 1435.

The evidence presented during the collateral evidentiary hearing concerned the same "subject matter [as] the evidence actually presented at sentencing." Beuke, 537 F.3d at 645–46. The collateral evidence provided a "larger pool of information of the same type already offered," Bradshaw, 681 F.3d at 770, which "amplified the themes [of]" the story that was told to the jury, Boyd, 592 F.3d at 1298, by providing "more information," Rhode, 582 F.3d at 1287, "more details," and "different examples" of Holsey's troubled, abusive childhood, Robinson, 300 F.3d at 1347. But the basic story of his troubled, abusive childhood was "nonetheless known to the . . . jury" when it sentenced him to death for the malice murder of Deputy William Robinson. Robinson, 300 F.3d at 1347. Because the evidence Holsey presented in the state collateral court about his troubled, abusive childhood was largely cumulative of the evidence he presented at trial, it was not unreasonable for the Georgia Supreme Court to describe it as largely cumulative. At least, fairminded jurists could disagree about whether it was. See Harrington, 131 S.Ct. at 786.

Two decisions, one from the Supreme Court and one from this Court, support our conclusion about this. The first is the Supreme Court's decision in Cullen. In that case, "[t]he mitigating evidence [at trial] consisted primarily of the penalty-phase testimony of [the petitioner's mother]" who testified, among other things, that the petitioner's stepfather was "abusive, or nearly so." Cullen, 131 S.Ct. at 1408–09. Declarations of the petitioner's siblings submitted during postconviction proceedings provided new and graphic details about that abuse, including that the petitioner's "stepfather beat him several times a week" with his fists, belts, and "at least once with a two-by-four board." Id. at 1424 (Sotomayor, J., dissenting); accord id. at 1410 (majority op.). Even so, the Supreme Court held that the "'new' evidence" of the abuse suffered by the petitioner "largely duplicated the mitigation evidence [of abuse] at trial" because it "support[ed] his mother's testimony that his stepfather was abusive and explain[ed] that [the petitioner] was beaten with fists, belts, and even wooden boards." Id. at 1409–10. If, as the Supreme Court held, the additional evidence in Cullen "largely duplicated" the evidence at the trial in that case, id. at 1409, the additional evidence in this case was "largely cumulative" of the evidence at the trial in this case. Or at least fairminded jurists could so find, as the five Justices who joined that part of the Supreme Court's Cullen decision did. See Harrington, 131 S.Ct. at

86

786.

The second decision that supports our conclusion is the <u>Sochor</u> case.  There, we held that the evidence of "childhood trauma" Sochor presented in the state collateral evidentiary hearing was cumulative of the evidence that had been presented on his behalf at trial.  <u>Sochor</u>, 685 F.3d at 1031–32.  We explained that "[a]lthough Sochor presented evidence during the [state collateral] evidentiary hearing that he suffered severe beatings and head injuries as a child and young adult," the sentencing judge and jury had heard essentially the same story.  <u>Id.</u> at 1031.  For example, his "sister testified during the penalty phase that Sochor's father . . . once 'got ahold of Sochor's hair, and he kept banging his head against the wall.'"  <u>Id.</u> (alteration omitted).  And Sochor's father testified at the penalty phase that his mother (not the father) had once "lost her temper and beat Sochor, then banged his head against the wall."  <u>Id.</u> (alteration and quotation marks omitted).  We held that evidence was "substantially similar," <u>id.</u> at 1032, to Sochor's siblings' testimony at the evidentiary hearing "that their father had brutally beaten Sochor when he was a child," <u>id.</u> at 1023, including his sister's testimony that "their father usually beat one of the children when he came home from work and that Sochor was his favorite target," <u>id.</u>

If, as we held, the additional evidence in <u>Sochor</u> was "substantially similar"

87

to the evidence at the trial in that case, the additional evidence in this case was "largely cumulative" to the evidence at the trial in this case. Or at least fairminded jurists could so find. Reeves' evidentiary hearing testimony and the depositions and affidavits Holsey submitted do bolster Reeves' and Clifford Holsey's sentencing phase testimony, and the facts from the records that were introduced at trial, by adding details about the beatings and verbal abuse that Holsey suffered. But those additional details tell the same story that Holsey's trial lawyers told at the sentencing phase.

The largely cumulative nature of Holsey's collateral hearing evidence about his childhood is different from the nature of the collateral hearing evidence that we described in Cooper. There we held that a Florida Supreme Court "cumulative" finding was an unreasonable determination of the facts because the evidence presented in the state collateral court did not tell the same story as the evidence presented at trial. See Cooper, 646 F.3d at 1353. In Cooper, the petitioner's mother had testified at sentencing that the extent of the childhood abuse inflicted on the petitioner "was the emotional abuse of his father not being involved in his life and getting whipped by a belt, sometimes leaving marks" and of seeing his father physically abuse her. Id. Evidence at the state collateral evidentiary hearing, however, showed that the defendant had suffered "horrible abuse" at the

88

hands of his father, id., including being "beaten, punched, and kicked" from the time "he was barely out of diapers," id. at 1342.

The Florida Supreme Court found that the petitioner's collateral challenge evidence was "cumulative to that presented at sentencing," holding that "a substantial part of the information regarding [his] disadvantaged childhood was presented at [his] trial" through his mother's testimony. Id. at 1353 (quotation marks omitted). We held that was an unreasonable determination of the facts because his mother's testimony "did not begin to describe the horrible abuse" suffered by the defendant at the hands of his father. Id. Instead, his mother's trial testimony only told the jury about the petitioner's absentee father occasionally whipping him with a belt. Id. That was a different story—not just a less detailed one—than the habeas story about the "horrible abuse" that the petitioner actually did suffer. Id. In contrast to the additional evidence presented in the state collateral hearing in Cooper, Holsey's additional evidence told largely the same story as his sentencing phase evidence, although it did add details and bolster that evidence.

For these reasons, we conclude that the Georgia Supreme Court's determination that the evidence Holsey's collateral counsel presented in the evidentiary hearing was largely cumulative of the evidence that his trial lawyers

had presented during the sentencing phase of his trial was not an unreasonable determination of fact under § 2254(d)(2).

D.

Holsey's last contention is that the Georgia Supreme Court was wrong to decide that he did not carry his burden of establishing that he was prejudiced by his trial lawyers' deficient performance at the sentencing phase of his trial. Prejudice, of course, means " a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695, 104 S.Ct. at 2069. And a reasonable probability, in turn, means "a probability sufficient to undermine confidence in that outcome." Johnson, 643 F.3d at 935 (quoting Porter v. McCollum, — U.S. —, 130 S.Ct. 447, 455–56 (2009)) (alterations and some quotation marks omitted). In determining whether a petitioner has carried his burden of showing prejudice from his trial counsel's failure to present all the mitigating circumstance evidence that his collateral counsel presented, courts must "evaluate the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—and reweigh it against the evidence in aggravation." Callahan v. Campbell, 427 F.3d 897, 936 (11th Cir. 2005) (alterations and quotation marks omitted); accord Johnson, 643 F.3d. at 935.

90

It is not enough for a habeas petitioner to convince a federal court that he was prejudiced by the failure to present the additional mitigating circumstance evidence, that there is a reasonable probability of a different result if it had been presented. Under the unreasonable application clause of 28 U.S.C. § 2254(d)(1), he must establish more because the question for a federal habeas court is "whether the state court's application of clearly established federal law was objectively unreasonable," Williams, 529 U.S. at 409, 120 S.Ct. at 1521, and an "unreasonable application of federal law is different from an incorrect application of federal law," id. at 410, 120 S.Ct. at 1522. Once again, a state court's application of federal law is unreasonable only if no "fairminded jurist" could agree with the state court's conclusion. Harrington, 131 S.Ct. at 786; see also Yarborough, 541 U.S. at 664, 124 S.Ct. at 2149; Hill, 662 F.3d at 1346. "[I]f some fairminded jurists could agree with the state court's decision, although others might disagree, federal habeas relief must be denied." Hill, 662 F.3d at 1346. So, to prevail, Holsey must establish that no fairminded jurist could conclude that he was not prejudiced by his trial lawyers' failure at the sentencing phase to present the additional evidence of his limited intelligence and his troubled, abusive childhood that his collateral counsel presented in the state collateral court. See id. Holsey

91

contends that he has done that, but we disagree.[23]

To begin with, "[t]his is not a case where the weight of the aggravating circumstances or the evidence supporting them was weak." Sochor, 685 F.3d at 1030 (alteration omitted); accord Kokal, 623 F.3d at 1347. Not at all. There was, and is, substantial evidence of aggravating circumstances, which makes it more difficult to establish prejudice under Strickland. See Sochor, 685 F.3d at 1030–33 (holding that a petitioner did not establish the prejudice prong of Strickland in part because there was strong evidence of the aggravating circumstance that the murder was "especially heinous, atrocious, and cruel"); Rose v. McNeil, 634 F.3d 1224, 1242 (11th Cir. 2011) (holding that a petitioner did not establish the prejudice prong of Strickland in part because there was "substantial evidence in aggravation"); Callahan, 427 F.3d at 938 (holding that strong aggravation

---

[23] Holsey also argues that the Georgia Supreme Court's evaluation of the mitigating evidence he presented at the evidentiary hearing was specifically contrary to the Supreme Court's application of the Strickland standard in Williams v. Taylor. That contention lacks merit. In Williams, the Court held that the Virginia Supreme Court's conclusion that the petitioner had not established prejudice was an unreasonable application of Strickland because the state court "did not entertain [the] possibility" that "[m]itigating evidence unrelated to dangerousness may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case." Id. at 398, 120 S.Ct. at 1516. The Georgia Supreme Court did not make the same mistake in Holsey's case. Nothing in its opinion suggests that it "rested its prejudice determination on the fact that [Holsey's] mitigating evidence did not undermine or rebut the evidence supporting the aggravating circumstance[s]." Williams v. Allen, 542 F.3d 1326, 1344 (11th Cir. 2008). Instead, the court explicitly examined the totality of Holsey's available mitigation evidence and weighed it against the evidence of aggravation. After doing so, the court concluded that the available mitigation evidence did not undermine its confidence in the jury's death sentence recommendation. See Holsey III, 642 S.E.2d at 61–62.

92

"demonstrates the burden a defendant faces when trying to overcome . . . harsh aggravating factors with mitigating evidence"); Kokal, 623 F.3d at 1347–48 (finding that the Florida Supreme Court's holding that a petitioner had not shown prejudice was not an unreasonable application of Strickland in part because "the aggravating circumstances . . . are especially powerful"); Rutherford v. Crosby, 385 F.3d 1300, 1316 (11th Cir. 2004) ("A third reason why the Florida Supreme Court's decision that [the petitioner] had not established prejudice is not objectively unreasonable is that this is not a case where the weight of the aggravating circumstances or the evidence supporting them was weak."); Crawford v. Head, 311 F.3d 1288, 1321 (11th Cir. 2002) (finding no prejudice in part because of the "strength of the evidence both of [the petitioner's] guilt and of the aggravating circumstances"); Hall v. Head, 310 F.3d 683, 706 (11th Cir. 2002) (holding "that the state court's calculus as to prejudice was [not] an unreasonable one" in part "because the aggravating evidence is strong"); cf. Williams, 542 F.3d at 1343 ("Further supporting a finding of prejudice is the fact that this case is not highly aggravated.").

The jury in this case found four statutory aggravating circumstances:  (1) Holsey murdered a deputy sheriff, see Ga. Code Ann. § 17-10-30(b)(8); (2) he murdered the deputy sheriff while trying to avoid arrest, see id. § 17-10-30(b)(10);

93

(3) he murdered the deputy sheriff while committing armed robbery, see id. § 17-10-30(b)(2); and (4) he murdered the deputy sheriff after he had already been convicted of a capital felony—the 1983 armed robbery of a Milledgeville convenience store, see id. § 17-10-30(b)(1).

In addition to those statutory aggravating circumstances, the jury heard evidence about Holsey's long history of violence against others. When he was fourteen years old, Holsey brought a butcher knife to school, put it to a schoolmate's throat, and hit that schoolmate in the face. When he was eighteen years old, Holsey robbed a Milledgeville convenience store by smashing the store clerk's face with a brick. For that violent behavior, Holsey pleaded guilty to and was convicted of armed robbery with serious bodily injury. Then, when Holsey was twenty-six years old, and while still on parole for his first armed robbery conviction, he stabbed a man four times and tried to shoot another person. For that violent behavior, he pleaded guilty to and was convicted of three more crimes: two counts of aggravated assault and one count of possession of a firearm by a convicted felon. The jury heard about all of those violent crimes during the sentencing phase. And, of course, it heard extensive evidence during the trial about how Holsey, when he was thirty years old, robbed yet another convenience store and, while fleeing, murdered Deputy Will Robinson. Holsey's extensive,

94

escalating history of violence against others, which began at least as early as age fourteen when he put a knife to a schoolmate's throat and continued throughout his life, culminating at age thirty in the murder of Deputy Robinson, is a "highly prejudicial aggravating circumstance." Frazier v. Bouchard, 661 F.3d 519, 533 (11th Cir. 2011); cf. Cummings v. Sec'y for Dep't of Corr., 588 F.3d 1331, 1368–69 (11th Cir. 2009) (holding that "details of [the petitioner's] three prior violent felony convictions" was "damaging testimony").

In addition to all of the aggravating circumstances evidence that was before the jury, the evidence that came in at the state collateral hearing included more reasons for the jury to give Holsey a death sentence. First, his Department of Corrections records, which Holsey himself put into evidence at the evidentiary hearing, establish that he committed at least one violent act while in prison. While incarcerated in 1985, he "jumped on" another inmate, breaking that inmate's teeth, bloodying his nose, and bruising his head. See Cummings, 588 F.3d at 1368–69 (holding that evidence of the petitioner's "repeated involvement in violent incidents while in prison" is "damaging"). Second, the State introduced evidence at the hearing showing that Holsey had been arrested in 1982 for battery, in 1983 for theft by shoplifting, and in 1990 for carrying a concealed weapon.

Finally, it came out during the evidentiary hearing that Dr. Sachy, the

95

State's expert witness, and Dr. Shapiro, the psychologist Holsey's trial lawyers had hired to evaluate him, were of the opinion that Holsey's history of getting in fights, committing aggravated assaults and armed robberies, skipping school and running away from home, and bringing a knife to school and putting it to another student's throat evidenced an antisocial personality disorder. Although Holsey was never formally diagnosed as having antisocial personality disorder, the testimony of those two experts, and other evidence corroborating what they said, would have been additional aggravating evidence because it indicates that, formal diagnosis or not, Holsey does have an antisocial personality disorder. And that is "a trait most jurors tend to look disfavorably upon" and evidence of which "is not mitigating but damaging." Kokal, 623 F.3d at 1349 (quotation marks omitted); Suggs v. McNeil, 609 F.3d 1218, 1231 (11th Cir. 2010) (describing as "potentially aggravating" evidence suggesting that the defendant has an antisocial personality disorder). The State could have put that damaging testimony before the jury through either or both of those experts if Holsey's trial lawyers had called Dr. Cunningham to testify for him, as Holsey's collateral counsel insist they should have. See generally Cullen, 131 S.Ct. at 1410 (explaining that if a petitioner calls an expert witness to testify at the sentencing phase it "open[s] the door to rebuttal by a state expert").

96

Evidence corroborating Dr. Sachy's and Dr. Shaprio's opinions was admitted during the sentencing phase. For example, there was a psychiatric evaluation that concluded Holsey suffered a "behavioral/personality disorder, which includes . . . [an] antisocial component." That evaluation noted that Holsey had, albeit barely, "as many antisocial behaviors as must be present in childhood histories of adults who are diagnosed as having antisocial personality disorders." There was also an offender profile report in the Department of Corrections records, which Holsey himself introduced at the evidentiary hearing, that states that he potentially has an "Antisocial Personality" and his "psychological profile suggests a very high risk for being assaultive and/or otherwise violent."

In addition to the substantial evidence of aggravating circumstances present in this case, as we have already discussed at some length, the evidence that Holsey presented at the evidentiary hearing about his limited intelligence and his troubled, abusive childhood was largely cumulative of the evidence his trial lawyers presented at the sentencing phase. The additional evidence he presented in the state collateral proceeding mostly substantiated, supported, and supplemented the themes of Clifford Holsey's and Reeves' trial testimony by providing more details and more examples of his limited intelligence and troubled, abusive childhood. See supra pp. 75–90. The cumulative nature of that evidence weakens its

usefulness to Holsey on the prejudice inquiry.  See, e.g., Cullen, 131 S.Ct. at 1409 (holding that the petitioner did not establish prejudice in part because "[t]he 'new' evidence largely duplicated the mitigation evidence at trial"); Wong, 130 S.Ct. at 387–88 (holding that the petitioner did not establish prejudice in part because "[s]ome of the [additional mitigating] evidence was merely cumulative of the humanizing evidence [the petitioner] actually presented; adding it to what was already there would have made little difference"); Sochor, 685 F.3d at 1031 (holding that a petitioner did not establish prejudice in part because "[m]ost of the . . . mitigating evidence that [he] produced in the evidentiary hearing was cumulative of evidence produced at the guilt and penalty phases of the trial"); Boyd, 592 F.3d at 1298 (holding that a petitioner did not establish prejudice in part because "much . . . of the 'new' testimony introduced at the post-conviction hearing would simply have amplified the themes already raised at trial"); Robinson, 300 F.3d at 1347 (holding that the Florida Supreme Court's holding that a petitioner had not shown prejudice was not unreasonable in part because "most of the new mitigation evidence is cumulative of the nonstatutory mitigating circumstances presented during resentencing"); Stewart v. Dugger, 877 F.2d 851, 856 (11th Cir. 1989) (observing that additional character witnesses "would not have had an effect on [the jury's] verdict" because "[s]uch testimony would have

merely been cumulative").

As we have also discussed, Holsey did present some evidence of his limited intelligence during the postconviction proceedings that might not have been cumulative, such as the testimony of Dr. Cunningham and Dr. Toomer that Holsey was mildly mentally retarded, which Dr. Cunningham called a "catastrophic disability," and the testimony of Dr. Shapiro explaining that someone functioning in the borderline mental retardation range is in approximately the bottom fifth percentile of intellectual functioning. But the potentially mitigating effect of Dr. Cunningham's and Dr. Toomer's testimony is weakened because it is contradicted by the testimony of three other mental health experts—Dr. Sachy, Dr. Shaprio, and Dr. Einhorn.[24] All three of those experts testified that Holsey is not mentally retarded but instead functions in the borderline mental retardation range, which is information the jury heard at the sentencing phase. And although the jury did not hear evidence that someone with borderline mental retardation functions in approximately the bottom fifth percentile of intelligence, it did hear evidence that a psychosocial evaluation of Holsey done by two mental health professionals

---

[24] Also, much of the nonexpert evidence that Holsey presented at the evidentiary hearing about his limited intelligence—that is, the depositions and affidavits from his family, friends, neighbors, teachers, coworkers, and others—was contradicted or counterbalanced by the State's evidence about Holsey's intelligence level. See supra pp. 56–57, 78 n.22.

when Holsey was fifteen years old had concluded that he was functioning academically at a third-grade level. And it did hear evidence that Holsey was a "very slow," "weak student" and that when he was fifteen years old he scored a 70 on an IQ test.

Finally, this is not a case where the additional evidence presented in the state collateral proceeding "adds up to a mitigation case that bears no relation" to the mitigation case "actually put before the jury." Rompilla v. Beard, 545 U.S. 374, 393, 125 S.Ct. 2456, 2469 (2005). In the four recent cases where the Supreme Court has held that a petitioner established prejudice based on his trial counsel's failure to present enough mitigating evidence at the sentencing phase, the evidence presented during the postconviction proceedings told a different story than the story told to the jury at trial.

In Porter, for example, "[t]he judge and jury at Porter's original sentencing heard almost nothing that would humanize Porter or allow them to accurately gauge his moral culpability." 130 S.Ct. at 454 (emphasis added). But there was powerful mitigating evidence available on those two topics, including "(1) Porter's heroic military service in two of the most critical—and horrific—battles of the Korean War, (2) his struggles to regain normality upon his return from war, (3) his childhood history of physical abuse, and (4) his brain abnormality, difficulty

reading and writing, and limited schooling." Id. Because the sentencing judge and jury "heard absolutely none of that evidence, evidence which might well have influenced the jury's appraisal of Porter's moral culpability," the Court held that Porter had established that he was prejudiced by his trial counsel's failure to present the evidence and that no fairminded jurist could disagree. Id. 454–56 (emphasis added) (alteration and quotation marks omitted).

The Supreme Court similarly held in Rompilla that a petitioner had established prejudice when the mitigating evidence he introduced in postconviction proceedings "add[ed] up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury." 545 U.S. at 374, 393, 125 S.Ct. at 2456, 2469. And in Wiggins v. Smith, 539 U.S. 510, 535, 123 S.Ct. 2527, 2542 (2003), the Court held that a petitioner had established prejudice when his trial counsel presented no evidence of his life history although there was "powerful" mitigating evidence available, including that the defendant "experienced severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother"; that he suffered "physical torment" in foster care; and that he had "diminished mental capacities." Finally, in Williams, the Court held that a petitioner had established prejudice when the mitigation evidence at trial described the petitioner as a "nice boy" and nonviolent,

but evidence adduced during the postconviction proceedings graphically described the petitioner's childhood, "filled with abuse and privation," and provided evidence that he was "borderline mentally retarded." 529 U.S. at 369, 398, 120 S.Ct. at 1500, 1515 (quotation marks omitted.)

We have relied on similar reasoning in cases where we have held that a petitioner established prejudice. In Cooper, we held that the petitioner had established prejudice when the trial evidence told the jury that "the extent of the abuse inflicted on Cooper was the emotional abuse of his father not being involved in his life and getting whipped by a belt, sometimes leaving marks," which "did not begin to describe the horrible abuse testified to by Cooper's brother and sister" at the collateral evidentiary hearing or even mention the serious physical abuse the petitioner's brother inflicted on him. 646 F.3d at 1353. And as we explained in Johnson when we held that the petitioner had established prejudice:

> The picture [that Johnson's trial lawyer] painted for the jury was of Johnson having cold and uncaring parents, something in the nature of the "American Gothic" couple. With a reasonable investigation, though, he could have painted for the jury the picture of a young man who resembled the tormented soul in "The Scream." There is nothing wrong with a Grant Wood approach, if that is all one has to use, but an Edvard Munch approach would have been far more likely to sway the jury to sympathy for Johnson.

643 F.3d at 936. The contrast between an "American Gothic" type story and "The Scream" type story in our Johnson case and in the Supreme Court's Porter, Rompilla, Wiggins, and Williams cases is not present here.

To be sure, some of the additional evidence that Holsey's collateral counsel presented would have been helpful to Holsey during the sentencing phase of his trial. But at this stage of the case, after the state court has adjudicated his claim on the merits, that helpful evidence is not helpful enough. Holsey must show more than that the evidence would have been helpful. He must show that the evidence would have been so helpful that every reasonable jurist, without exception, would have concluded that there is a reasonable probability that the sentence would have been different if the jury had heard all of the aggravating circumstances evidence and all of the mitigating circumstances evidence. He must show not only that the Georgia Supreme Court's contrary conclusion is wrong but that it is so wrong that no fairminded jurist could reach that conclusion. See Harrington, 131 S.Ct. at 786; Yarborough, 541 U.S. at 664, 124 S.Ct. at 2149; Hill, 662 F.3d at 1346; Sochor, 685 F.3d at 1028. He must show that the Georgia Supreme Court's conclusion was an "extreme malfunction[] in the state criminal justice system[]" that is so "well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, 131 S.Ct. at 786–87. Holsey

103

has not shown us that.  He has not carried his burden.  He has not cleared the high hurdle that § 2254(d)(1) puts in his way.

Given the strong evidence of multiple aggravating circumstances, including Holsey's extensive, escalating history of violence, the largely cumulative nature of the additional evidence Holsey's collateral counsel presented in the state collateral proceedings, and the weakened mitigating value of the potentially noncumulative evidence that they presented, a fairminded jurist could agree with the Georgia Supreme Court that Holsey was not prejudiced by his trial lawyers' assumed deficiencies at the sentencing phase.  See Harrington, 131 S.Ct. at 786; Yarborough, 541 U.S. at 664, 124 S.Ct. at 2149; Hill, 662 F.3d at 1346; Sochor, 685 F.3d at 1028.  For that reason, we conclude that the Georgia Supreme Court did not unreasonably apply Strickland when it held that he was not entitled to relief.[25]

V.

For the reasons we have discussed, we **AFFIRM** the district court's denial of Holsey's 28 U.S.C. § 2254 habeas corpus petition.

---

[25] We do not address whether we would have concluded under a de novo standard that there was no prejudice, just as the dissenting opinion does not address whether it would have concluded under § 2254(d)(1)'s standard that the Georgia Supreme Court's determination that there was no prejudice was "contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).

Edmondson, Circuit Judge, concurring in the judgment:

I stand with Judge Carnes about the correct judgment in this appeal: AFFIRM the District Court's judgment to deny habeas corpus relief to the state prisoner petitioner. I -- very respectfully -- do not join in Judge Carnes's erudite opinion. I stress that it is not because the opinion says something that I am sure is wrong or I am sure is even likely wrong. I agree with much of the opinion, at least. But the opinion says a lot and says more than I think is absolutely needed.

In my experience, longish opinions always present a strong possibility of error lurking somewhere in the text. That the opinion writer is a skilled and careful judge does not eliminate the risk. Furthermore, no one wishes to join in an opinion that they do not understand fully. It is hard, time-consuming, painstaking work for the panel's other judges to check long opinions, line by line, cited case by cited case. (Of course, always other cases are awaiting decision and also demand the judges' time and attention.)[1] Moreover, long opinions, even if correct

---

[1] It seems to me that the incidence of long opinions has been on the rise in the last decade or, at least, more are coming across my desk. I should say that I, broadly speaking, do not agree that the length of an opinion necessarily reflects the thought, labor, and care that has been invested by judges in their endeavor to decide the case correctly. The shorter opinions often reflect the greater study and thought leading up to the ultimate decision. Mark Twain touched on a related idea: "If you want me to give you a two-hour presentation, I am ready today. If you want only a five-minute speech, it will take me two weeks to prepare." Nevertheless, that some cases might truly demand long opinions, I do not doubt. And I believe I understand why Judge Carnes has gone longer in this case.

in every detail, generally make it harder for readers to separate a <u>holding</u> from

<u>dicta</u> (or less than dicta: words only of explication and nothing more).  The

confusion of holding and dicta makes correctly deciding future cases more

difficult, when judges are looking back for precedents.[2]  Sometimes, the oddest

bits are lifted out of opinions -- especially the longer ones (often words as to some

peripheral point) -- and later quoted flatly as law: as if someone was quoting a

statute.  So, I feel more comfortable today just focusing briefly on my own view of

a vital point.

Georgia's Supreme Court decision is entitled to deference.  In the context of

the Georgia Supreme Court's opinion, I do not recognize the phrase, "largely

cumulative," as really a "determination of fact" within the meaning of the

AEDPA; I see the words as merely a part of an appellate court's report on how its

decision was thought through and reached.  As such, the "largely cumulative"

phrase, in itself, is insignificant to me, although the ultimate decision Georgia's

Supreme Court reached on prejudice is significant.  For background, see *Evans v.*

*Sec'y, Dep't of Corr.*, 681 F.3d 1241, 1272 n. 4 (Edmondson, J., dissenting)

(vacated for rehearing en banc). Furthermore, I do not recognize anything done in

---

[2] Longer opinions, simply by virtue of their length, burden the Bar whose members try to stay current with the Court's thinking.  Also, I worry that long opinions are generally less able to be fully understood by the public than are shorter opinions:  some loss in transparency.

106

*Cooper v. Sec'y, Dep't of Corr.*, 646 F.3d 1328 (11th Cir. 2011), as holding something to the contrary to my view today or as controlling of this case. Unlike this case, *Cooper* is a case which significantly involved truly erroneous fact findings (arguably including the word "cumulative") about a past event: the specific content of Defendant's mother's trial testimony -- findings made by the state habeas court which were later approved by the state appellate court.

Given the full record, I believe the deference we are commanded to give by the AEDPA to the decision of Georgia's supreme court compels an affirmance today. By the way, the pertinent state court decision that is due our deference is this decision: that the full evidentiary record before the state supreme court did not show the prejudice required by *Strickland*. Objectively reasonable jurists might disagree about prejudice on this record;[3] but to me, a determination that Petitioner did not show the required prejudice is within the outside border of the range of reasonable.

---

[3] For the sake of argument only, I assume today that the performance of Petitioner's trial counsel fell short under the *Strickland* standard.

BARKETT, Circuit Judge, dissenting:

For the reasons stated in my dissent in <u>Hill v. Humphrey</u>, 662 F.3d 1335, 1365-78 (11th Cir. 2011) (en banc), I continue to believe that Georgia's requirement that defendants prove mental retardation beyond a reasonable doubt is unconstitutional under <u>Atkins v. Virginia</u>, 536 U.S. 304 (2002).

I also believe that the Georgia Supreme Court's "decision" that the ineffectiveness of counsel did not prejudice Holsey is "based on an unreasonable determination of the facts," <u>see</u> 28 U.S.C. § 2254(d)(2) (2006), and therefore, we must conduct a <u>de novo</u> review. <u>See</u> <u>Cooper v. Sec'y, Dep't of Corr.</u>, 646 F.3d 1328 (11th Cir. 2011); <u>Jones v. Walker</u>, 540 F.3d 1277, 1288 n.5 (11th Cir. 2008) (en banc). A <u>de novo</u> review compels the conclusion that the omission of evidence describing the nature and extent of Holsey's abusive childhood along with evidence of his mental retardation prejudiced him at the sentencing phase of his trial in violation of <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).

More specifically and as demonstrated below, the Georgia Supreme Court's determination that the extensive evidence offered on collateral review was "largely cumulative" is unreasonable in light of the sparse—almost non-existent—evidence of childhood abuse and mental retardation presented in Holsey's trial. <u>See</u> 28 U.S.C. § 2254(d)(2). At trial, a brief mention was made of the fact that Holsey

108

was beaten, without any further explanation or description.  The jury never learned that throughout his childhood he was subjected to abuse so severe, so frequent, and so notorious that his neighbors called his childhood home "the Torture Chamber."  Likewise, with reference to his status as borderline mentally retarded, a diagnosis that is undisputed by the state's expert witnesses, the jury heard only that a report listed him as borderline mentally retarded without any testimony to explain the extent and consequences of his condition.  Only one juror's vote was necessary to impose a life sentence.[1]  The record here demonstrates that "both the nature and the extent of the abuse the petitioner suffered" would have affected the probability that "at least one juror" would have voted for a sentence less than death, see Wiggins v. Smith, 539 U.S. 510, 535, 536 (2003) (emphasis added), and the mitigating evidence describing the behavioral and cognitive impact of Holsey's borderline retardation would have influenced "the jury's appraisal of his moral culpability," see Williams v. Taylor, 529 U.S. 362, 398 (2000).

With reference to de novo review, trial counsel was so deficient that confidence in the outcome of Holsey's sentencing is undermined and he is entitled

---

[1] See Ga. Code Ann. § 17-10-31(c) ("If the jury is unable to reach a unanimous verdict as to sentence, the judge shall dismiss the jury and shall impose a sentence of either life imprisonment or imprisonment for life without parole."); Humphrey v. Morrow, 717 S.E.2d 168, 173 (Ga. 2011) ("Georgia's death penalty laws . . . provide for an automatic sentence less than death if the jury is unable to reach a unanimous sentencing verdict . . . .").

to a new sentencing hearing.  Rather than conduct an investigation that could lead

to the discovery and presentation of the important mitigating evidence delineated

below, Holsey's lead defense lawyer drank a quart of vodka every night of

Holsey's trial while also preparing to be sued, criminally prosecuted, and

disbarred for stealing client funds.  He admitted during collateral proceedings that,

at the time he was preparing for Holsey's capital murder trial, he "probably

shouldn't have been allowed to represent anybody" due to his condition.  The

Georgia trial court, which is the only court to have presided over the receipt of live

testimony and evidence on collateral review, held that "no one can seriously

believe that [Holsey] received the constitutional guarantees of the Sixth

Amendment right to effective assistance of counsel."  The mitigating evidence

which should have been presented would have created a reasonable probability

that "at least one juror" would have voted for a sentence less than death, see

Wiggins, 539 U.S. at 535, 536, even weighed against the aggravating factors

presented.  I amplify each of these points below.

## I. The Mitigating Evidence of Childhood Abuse is Not "Largely Cumulative" of the Sentencing-Phase Testimony

The brief mention of abuse at the sentencing phase came from two

witnesses: Holsey's sister, Regina Reeves, and Clifford Holsey, who is not related

to Wayne Holsey.[2]  Regina Reeves' testimony made a brief, passing reference to

Holsey while explaining her own move out of her mother's house as she

approached her majority.  She explained why she left home at the age of seventeen

to "live with friends."

> Q: And what caused you to leave home?
> A: We were having—I felt that I was—that we were having a lot of problems. I hated it there. Things were bad. I was a mother, you know, by the time I left home. I had my daughter when I was 17. I graduated from high school when I was 17. I didn't feel that I was, you know, treated well, that I was appreciated. And I felt that I could do better, you know, somewhere else because I just felt that things were horrible there.
> Q: And what about being there was so horrible? . . . .
> A: Okay. I was tired of taking beatings. I don't think it was, you know, so horrible that we didn't, you know, have anything. A lot of people didn't have anything. But I always felt that you could be—not have more than anybody else but still get treated better than what we were.
> Q: And when you say you were tired of taking beatings, who beat y'all?
> A: My mother. (Witness crying)
> Q: Did she beat all the children?
> A: The oldest three mostly.
> Q: That was you and Wayne and Angela?
> A: (Witness nods affirmatively.) Yes.

Counsel asked Regina no further questions about beatings or abuse and this was

the totality of testimony from any family member about abuse.[3]

---

[2] Holsey goes by his middle name, "Wayne," but is also referred to by several witnesses by his first name, "Robert."

[3] The majority refers to a two-page "home evaluation" created by a social worker at Georgia's Youth Development Center, which Holsey attended when he was fifteen years old. See Majority op. at 81-82.  The report contains a two-sentence summary of the social worker's "impressions" of Holsey's mother, in which the social worker states his "doubts as to her ability

Clifford Holsey, who was called to describe a bar fight involving Holsey, stated during cross examination that Wayne Holsey's mother "would scold . . . and beat" the children, but admitted that he had never actually seen her beat them. He simply stated:

> Well, I think Wayne came up the best that he could. I think he was neglected from his mother. She, you know, kind of like—came up kind of like child abuse. And she just didn't see about them, you know, kind of walked all over them a little bit, and done everything.

Regina and Clifford's testimony can hardly be characterized as having "highlighted" Holsey's history of abuse, as the Georgia Supreme Court determined. See Schofield v. Holsey, 642 S.E.2d 56, 61-62 (Ga. 2007). It hardly comports with the "Torture Chamber" described by Holsey's neighbors and family members at the collateral review hearing. Holsey's sister testified on collateral review, but not at trial, that Wayne Holsey was beaten with extension cords, shoes, broom handles, or whatever objects their mother could find, leaving permanent

---

to cope with Angela and Robert [Holsey]," and that Holsey's mother "loves and cares for [the children] a great deal, but she has no idea how to control them without resorting to excessive punishment." The report also includes positive commentary on Holsey's mother's "parental commitment," including that "she is willing to give Robert all the encouragement that he needs" and that "[s]he foresees no problems with Robert and his sister, Angela, returning from the Youth Development Center at the same time." Taken in the context in which it was presented to the jury and given the equivocal nature of the social worker's assessment of Mary Holsey, this document cannot reasonably be characterized as "highlighting" Holsey's abusive background, much less as "largely cumulative" of the evidence introduced by collateral counsel, especially when there is no indication that trial counsel ever made the jury aware of the report's assessment of Mary Holsey's parenting ability. See Schofield v. Holsey, 642 S.E.2d 56, 61-62 (Ga. 2007).

scars on his body. His mother punished him by holding his head under water while he cried and struggled to breathe. The beatings would spill out of the house and into the yard and the street, as people from the neighborhood stood by, watching. These beatings would occur for any reason or no reason at all, or, as Regina put it on collateral review, but not at trial, when her mother "felt that the house wasn't clean," was "just frustrated," "jealous," or "you know, just about anything."

Holsey wet the bed until he was thirteen years old, and Regina testified on collateral review, but not at trial, that on occasion his mother stayed up at night so that, when she heard the urine leaking to the floor through Holsey's thin mattress, she could beat him out of his sleep with an extension cord. She beat him when he went across the street to pick blackberries. Even eating meals, such as there were, became an opportunity for abuse, as Holsey's mother punished him for asking for more food by forcing him to eat chicken bones. Regina told the judge on collateral review that abuse of this magnitude happened "daily [or] every other day."

Members of Holsey's extended family and community also came forward to testify to the notoriety of the abuse inflicted on Holsey. Bertha Ingram, Holsey's adult cousin, testified to witnessing Holsey's mother beat him with the pointed end

113

of her high-heeled shoes and other household objects, burn him with a curling iron, and lock him in a closet.  She corroborated Reeves' testimony that abuse on this scale occurred on a daily basis, testifying that "it was a rare evening" when these beatings would not occur for reasons as trivial as Holsey opening the refrigerator to look for food.

Essie Anderson, a friend of Holsey's mother who worked at the local hospital and visited the apartment regularly, stated that the abuse was well known throughout the neighborhood, and reflected that "we were all guilty for letting Mary [Holsey's mother] get away with the way she mistreated her kids, but we were all so scared of her ourselves."  When Anderson tried to intervene, Holsey's mother would shout at her "I'll kill him if I want to. These are MY kids." Neighbor Catherine Harris recalled going to Holsey's apartment when he was a child and watching Holsey's mother attack him and his sister with a belt or curling iron "while they tried to squat down in a corner and curl up in a little ball to fend off her blows."  Another neighbor, Sandra Francis, recounted the times she had watched out the window and shook with fear while Holsey's mother beat him in the yard, and that after these beatings, "it wasn't uncommon for [Holsey] to curl up in the bushes outside the Housing project office . . . and sleep there until morning."

114

The Georgia Supreme Court's decision that Holsey was not prejudiced by the omission of this evidence was based on its determination that Holsey's original sentencing hearing "highlighted" Holsey's abusive history such that his collateral evidence was "largely cumulative" of what was introduced at trial. However, this determination is unreasonable in light of the facts contained in this record. See § 2254(d)(2). Because the Georgia Supreme Court's "decision" that Holsey was not prejudiced at sentencing was "based on" an unreasonable factual determination, we owe it no deference. See Jones, 540 F.3d at 1288 n.5; see also Callahan v. Campbell, 427 F.3d 897, 927 n.26 (11th Cir. 2005) (emphasizing that § 2254(d)(2) applies where "'the adjudication of the claim . . . resulted in a decision that was based on an unreasonable determination of the facts'") (emphasis in original) (quoting § 2254(d)(2)); Harvey v. Warden, 629 F.3d 1228, 1252 (11th Cir. 2011) (applying § 2254(d)(2) to state court's factual determinations underpinning its conclusion that the petitioner was not prejudiced under Strickland).

In Cooper v. Secretary, Dep't of Corrections, 646 F.3d 1328 (11th Cir. 2011), we likewise concluded that a state court's rejection of a petitioner's Strickland claim was based on an unreasonable factual determination under a materially indistinguishable set of facts. In Cooper, the Florida Supreme Court rejected Richard Cooper's Strickland claim on the ground that "'a substantial part

115

of the information regarding Cooper's disadvantaged childhood was presented at Cooper's trial,'" and therefore "'in large part, introduction of the evidence proffered [on collateral review] would have been repetitive.'" See Cooper, 646 F.3d at 1348 (quoting Cooper v. State, 856 So. 2d 969, 976 (Fla. 2003)). However, we held that the Florida Supreme Court's conclusion that the collateral testimony was "in large part . . . repetitive of" the sentencing phase testimony was an unreasonable determination of the facts under § 2254(d)(2), because this testimony omitted the "specifics of the abuse" directed against Cooper and "did not begin to describe the horrible abuse testified to [on collateral review]." Id. at 1352-53.

Every one of the dispositive facts that led this Court in Cooper to find the state court's factual determinations unreasonable under § 2254(d)(2) is present in this case. First, Holsey's sentencing phase testimony was even less illuminating as to the nature and extent of abuse than in Cooper, where the defendant's mother testified that Cooper's father beat him with a belt, leaving marks on his body, was "very hard" and "authoritarian" with him, and defense counsel emphasized that Cooper's "horrible" and "tragic" family life was "something that none of [the jurors] ha[d] experienced." Id. at 1337, 1339. Moreover, during proceedings before the sentencing judge, a defense psychologist testified that Cooper had had a

116

"'horrendous background,'" that his father was "'exceptionally abusive, both physically and verbally,'" and that the impact of the "terror-filled years" of abuse his father inflicted caused Cooper to suffer lasting psychological harm. Id. at 1340.

Second, the disparity between the sentencing testimony about abuse and what was revealed on collateral review in Holsey's case was even greater than that in Cooper. On collateral review, the "'description, details, and depth of abuse'" presented by Cooper "'far exceeded what the jury was told'" at Cooper's sentencing. Id. at 1354 (quoting Johnson v. Sec'y, 643 F.3d 907, 936 (11th Cir. 2011)). Similarly, the "description, details, and depth of abuse" presented by Holsey on collateral review "far exceeded" the sentencing testimony at Holsey's trial, and the abuse revealed by Holsey's collateral evidence is certainly as extensive and atrocious as the evidence omitted in Richard Cooper's trial.

Finally, the erroneous characterizations of the sentencing phase testimony about abuse are the same in both cases. In Cooper, the state court described the "substantial part of the information" on collateral review as "in large part . . . repetitive" of the sentencing testimony. See id. at 1348 (internal quotation marks omitted). Likewise, the Georgia Supreme Court characterized the information presented on collateral review as "largely cumulative" of or "highlight[ing]"

117

Holsey's sentencing phase testimony. Based on the almost identical facts of

Cooper, the same legal conclusion is compelled here: the Georgia Supreme

Court's characterization of the collateral evidence as largely cumulative of the

testimony at trial is an unreasonable determination of the facts under § 2254(d)(2).

The majority disparages Cooper as "an outlier." See Majority op. at 68.

However, we have no authority to disregard a previous decision of another panel

arising from facts that, like the facts of Cooper, are materially indistinguishable

from those before us.[4] See Anders v. Hometown Mrtg. Svcs., Inc., 346 F.3d 1024,

1031 (11th Cir. 2003). That rule "is not dependent upon a subsequent panel's

appraisal of the initial decision's correctness." Smith v. GTE Corp., 236 F.3d

1292, 1302 (11th Cir. 2001) (internal quotation marks omitted).

Moreover, Cooper is not an outlier and is fully consistent with our cases,

which, in applying § 2254(d)(2), have reviewed state appellate courts' resolutions

of factual issues which are the predicates to their legal conclusions. See, e.g.,

Hardy v. Comm'r, Dep't of Corr., 684 F.3d 1066, 1087-88 (11th Cir. 2012)

(applying § 2254(d)(2) to factual determinations underpinning decision whether

---

[4] As demonstrated by the facts described above, I cannot agree with the majority's characterization of Holsey's case as different because Cooper presented "a different story-not just a less detailed one" than what was presented on collateral review. See Majority op. at 89. The difference between the sentencing evidence and collateral evidence in Cooper is no greater than the disparity between the sentencing evidence and collateral evidence at issue here.

118

defendant invoked his Miranda right to remain silent); Harvey, 629 F.3d at 1252

(applying § 2254(d)(2) to state court's determination that defendant was not

prejudiced under Strickland by counsel's statements in opening argument because

these statements were factually similar to statements in the defendant's

confession); Bui v. Haley, 321 F.3d 1304, 1315-16 (11th Cir. 2003) (applying §

2254(d)(2) to appellate court's factual determination that was "subsidiary" to a

legal conclusion). Similarly, in Cooper, as in Holsey's case, the state court's

characterization of evidence as cumulative was predicated on a subsidiary

determination that the two bodies of evidence being compared are factually

comparable to each other. See Harvey, 629 F.3d at 1252 (reviewing under §

2254(d)(2) a state court's comparison of the factual content of two statements

contained in the record). The Georgia Supreme Court's factual determination was

"subsidiary" to the ultimate legal decision that the petitioner had not shown

prejudice under Strickland, and it involved a comparison of the collateral evidence

with the trial evidence. See Bui, 321 F.3d at 1316. In both Cooper and Holsey's

cases, the state appellate courts' decisions that no prejudice was established were

predicated on factual determinations that were "unreasonable . . . in light of the

evidence presented in the State court proceeding." See § 2254(d)(2).[5] Cooper is

consistent with the cases from our circuit applying § 2254(d)(2).

Moreover, both the Supreme Court and our court have held prejudice to be

established under Strickland where the testimony presented at trial failed to

describe the "nature and extent" of childhood abuse suffered by the petitioner. If

such evidence is capable of establishing prejudice, it cannot reasonably be

dismissed as "largely cumulative" of testimony that merely mentions that the

defendant was beaten. Specifically, in Wiggins, it was precisely the "nature and

extent of the abuse [the] petitioner suffered" that led the Supreme Court to

conclude that any reasonable counsel would introduce evidence of the petitioner's

abusive childhood due to its likely impact on the jury. See 539 U.S. at 535-37

(emphasis added). Similarly, in Williams, the Court held that the petitioner was

prejudiced by counsel's omission of a "graphic description of [the petitioner's]

---

[5] The majority asserts that Cooper is in conflict with Cullen v. Pinholster, 131 S. Ct. 1388 (2011), because the majority reads Cullen as establishing that § 2254(d)(2) cannot apply to a state court's characterization of evidence as cumulative. See Majority op. at 69-70. However, § 2254(d)(2) applies to an appellate court's construction and characterization of the facts in the record, including mixed questions of law and fact. See, e.g., Harvey, 629 F.3d at 1252 (applying § 2254(d)(2) to state court's comparison of factual content of two statements); Gore v. Sec'y, Dep't of Corr., 492 F.3d 1273, 1297-98 (11th Cir. 2007) (applying § 2254(d)(2) to "mixed question of fact and law" of whether defendant's Miranda rights were "scrupulously honored"). Moreover, Cullen does not address, let alone hold, that § 2254(d)(2) does not apply to a state court's characterization of evidence as cumulative, and thus, cannot conflict with Cooper. See United States v. Kaley, 579 F.3d 1246, 1255 (11th Cir. 2009).

120

childhood" including "documents . . . that <u>dramatically described</u> mistreatment, abuse, and neglect during his early childhood." 529 U.S. at 370, 398 (emphasis added). And in <u>Porter v. McCollum</u>, 130 S. Ct. 447 (2009) (per curiam), the Court held that "it is unreasonable to discount to irrelevance the evidence of [a defendant's] abusive childhood." 130 S. Ct. at 455. In each of these cases, it was not the omission of an acknowledgment of abuse that the Court found prejudicial, but the omission of testimony that described this abuse in sufficient detail for the jury to understand what actually occurred.

Similarly, in <u>Williams v. Allen</u>, 542 F.3d 1326, 1342 (11th Cir. 2008), notwithstanding that the defendant's mother testified at sentencing that his father beat him "with his fists," "many times," "whipped him more than he should," and once beat him so severely that the defendant escaped to a neighbor's house and called the police, <u>see</u> <u>Williams</u>, 542 F.3d at 1329, we held the defendant was prejudiced by the omission of his sister's account of abuse because her testimony made clear that "the violence experienced by Williams as a child far <u>exceeded</u>—in both <u>frequency</u> and <u>severity</u>—the punishments described at sentencing." <u>See</u> <u>id.</u> at 1342 (emphasis added).

Finally, in <u>Johnson v. Secretary, Dep't of Corrections</u>, 643 F.3d 907 (11th Cir. 2011), we held that prejudice was established because of the "<u>description,</u>

121

details, and depth of abuse in [the defendant's] background that were brought to light" on collateral review. See Johnson, 643 F.3d at 936 (emphasis added). In Johnson, counsel deficiently failed to introduce detailed evidence about how the defendant and his siblings "huddled together in terror" when their father would beat their mother, that their parents engaged in "knockdown, drag-out fights" that sometimes led them to call the police, and that the defendant's mother "beat him more severely than the other children—sometimes with her knuckles and sometimes with a leather strap." Id. (internal quotation marks omitted).

Although mention was made by Clifford Holsey and Regina Reeves about beatings, it is no less true in Holsey's case than it was in Johnson that the "description, details, and depth" of the abuse are what gives this evidence mitigating value and are what was completely omitted in Holsey's trial. Indeed, we held in Johnson that prejudice was established in part because the evidence at trial "was not nearly as helpful to [the defendant's] case as it could have been" and "misleadingly minimized the mitigating circumstances." Id. Counsel's failure to present any testimony about the "nature and extent" of the abuse Holsey suffered, Wiggins, 539 U.S. at 535, similarly misled the jury about Holsey's background because it "minimized the mitigating circumstances" of Holsey's abusive history.

122

The cases relied upon by the majority are inapplicable to the facts of this case. In the cases cited by the majority, there either was descriptive evidence at sentencing conveying the nature and extent of the abuse suffered by the petitioner, or the mitigating evidence introduced on collateral review did not resemble the consistent, voluminous, and unrebutted evidence of pervasive and severe abuse that is at issue in this case. Thus, in Sochor v. Secretary, Dep't of Corrections, 685 F.3d 1016 (11th Cir. 2012), the testimony during the petitioner's sentencing phase did describe, in extensive and even greater detail than the testimony on collateral review, the abuse that the petitioner regularly suffered as a child, including that he suffered multiple head injuries inflicted in an identical manner to the head injury described on collateral review. See Sochor, 685 F.3d 1021-22.[6] In

---

[6] Indeed, the court in Sochor noted the original sentencing testimony as follows:

Sochor's brother, Gary, testified that his "whole childhood was memories of nothing but getting beat" by his parents, and that Sochor "took a lot of . . . beatings" that were intended for Gary. Gary testified that he "remember[ed] my mother, when [his] dad would get home, yelling at my dad to spank us for this or for that, and he would start in with the belt, I mean a big belt, and just beat, beat, beat." Sochor's sister, Cathy Cooper, testified that Sochor "had a pretty rough life" and that all of their parents' "frustrations and everything got taken out on" Sochor. Cooper stated that their father "used to be a boxer," "knew how to hit," and had a "very quick and violent temper." Cooper testified that "[t]here were times where literally you'd have to pull [her father] off of" Sochor. Sochor's father "constantly hit [Sochor] with his fist. He'd hit him in the face, in the arms, and . . . would just be in a rage, anyplace he could hit him." Cooper testified that Sochor "constantly had his lips split open, black eyes, bruises all over his body." Cooper stated that she "remember[ed] very clearly that [her] dad had [Sochor] down on the floor and was strattled over the top of him and just, you know, like plummeting with his fist." Sochor's father "got ahold of [Sochor's] hair, and he kept banging his head against the wall." Sochor "just sort of

123

<u>Sochor</u>, the jury was told about the kind, extent, and severity of the abuse and not simply that beatings occurred that may or may not have even amounted to abuse.[7]

Likewise, in <u>Cullen v Pinholster</u>, 131 S. Ct. 1388 (2011), the testimony presented on collateral review was relatively limited in scope and did not approach a description of the scale of abuse at issue here, where not only family members but also members of Holsey's community stepped forward to describe the severity and widespread notoriety of this abuse. <u>See</u> <u>Cullen</u>, 131 S. Ct. at 1409-10. The evidence presented at the collateral hearing provided far less support than that presented on behalf of Holsey at his collateral hearing. <u>See</u> <u>Pinholster v. Ayers</u>,

---

slid to the floor, and then dad just started kicking him."

<u>Sochor</u>, 685 F.3d at 1022-22. Sochor's parents also testified at the original sentencing hearing, describing his abuse in detail. <u>See</u> <u>id.</u> at 1022.

[7] Similarly, <u>Robinson v. Moore</u>, 300 F.3d 1320 (11th Cir. 2002), is not comparable. Unlike Holsey's case but like <u>Sochor</u>, the actual sentencing phase testimony provided an extensive description of specific instances of abuse and the additional details only presented other instances of abuse. <u>Compare</u> <u>Robinson</u>, 300 F.3d at 1329-30 (describing sentencing phase testimony as explaining that the petitioner was exposed to "considerable physical abuse" such as being beaten with a belt or switch while bound at the wrists, being forced to sit with a broom handle between his legs while being struck by his grandfather, that neighbors observed him with bruises and told him not to go home, and that petitioner was sexually abused by relatives and while working in a migrant labor camp), <u>with</u> <u>id.</u> at 1338-39 (describing collateral child abuse evidence as consisting of evidence that the defendant was also beaten with "belts, electric cords, or whatever," and would be beaten if he stopped picking crops for his grandfather). A holding that a petitioner was not prejudiced by counsel's failure to present "more details" or "different examples" of abuse does not remotely suggest that it is reasonable to discount evidence of child abuse where <u>no</u> details or examples that would enable the jury to understand the nature and extent of this abuse were presented at sentencing.

590 F.3d 651, 712 (9th Cir. 2009) (en banc), (Kozinski, C.J., dissenting), rev'd, 131 S. Ct. 1388 ("[W]hat's remarkable is how little support the family members provide for Pinholster's theory of extreme abuse and deprivation. . . . What's remarkable here is just how weak this testimony actually is."); id. at 713 ("The simple fact is, there's nothing supporting the theory of abuse or deprivation, in stark contrast to the evidence in many other cases.") (citing Wiggins, 539 U.S. at 517; Williams, 529 U.S. at 370). Moreover, the ostensibly mitigating testimony at issue in Cullen was undermined by the fact that the petitioner himself denied that any abuse had actually occurred, and in fact described the purported abuse by his stepfather as "'discipline' from which he 'benefitted.'" See Pinholster v. Ayers, 525 F.3d 742, 767-68 (9th Cir. 2008), vacated en banc, 590 F.3d 651 (9th Cir. 2009), rev'd, 131 S. Ct. 1388 (2011); see also id. at 767 ("Pinholster's primary complaint about his step-father was that 'he didn't seem to want the kids

around.'").[8]  In contrast, in Holsey's case, the evidence of pervasive abuse is

uncontradicted.

## II. The Collateral Hearing Evidence of Mental Retardation Was Not "Largely Cumulative" of That Presented at the Sentencing Hearing

The Georgia Supreme Court's determination that trial testimony

"highlighted Holsey's limited intelligence" such that his mitigating evidence was

---

[8] Nor is the remainder of the cases cited by the majority comparable to this one.  In Wong v. Belmontes, 130 S. Ct. 383 (2009), the petitioner did not offer evidence that he was a victim of child abuse on collateral review, only that his family "lived in a state of 'constant strife'" that was not directed at him.  See Wong, 130 S. Ct. at 388.  And the sentencing phase testimony provided a detailed account of that violence.  See Belmontes v. Ayers, 529 F.3d 834, 885 (9th Cir. 2008) (O'Scannlain, J., dissenting), rev'd, 130 S. Ct. 383 (recounting that, at trial, "Belmontes's mother spoke of how Belmontes's father used to beat her, once breaking her arm, and another time stabbing her and of how Belmontes suffered from the departure of her second husband and became 'difficult to control.'").  In Boyd v. Allen, 592 F.3d 1274 (11th Cir. 2010), we distinguished the facts of Wiggins v. Smith and Williams v. Taylor and discounted the petitioner's mitigating evidence because, unlike Wiggins and Williams, this evidence did not clearly reveal that the petitioner himself was regularly exposed to abuse, and because "the evidence [was] mixed on the impoverished conditions found in [the petitioner's] home."  See Boyd, 592 F.3d at 1300; see also id. at 1299-1300 ("There is also no evidence to suggest that Boyd's father was ever directly violent towards him, and it is unclear how much of his stepfather's violence was directed at Boyd himself.").  Moreover, we repeatedly emphasized throughout our decision that discounting this limited evidence of child abuse was justified because of the horrific nature of the petitioner's crime, which involved the premeditated torture and murder of two victims followed by deliberate defacement of their corpses.  See id. at 1302-03, 1302 n.7.  Accordingly we stressed that "in brutal torture-murder cases like this one, this Court generally has not found Strickland prejudice, even where the petitioner's counsel may have performed deficiently by failing to uncover and present evidence of troubled and abusive childhoods."  Id. at 1301.  Finally, Rhode v. Hall, 582 F.3d 1273 (11th Cir. 2009) (per curiam), did not include any claim that trial counsel was deficient in failing to introduce evidence of abuse in the petitioner's background, and so is not relevant to the reasonableness of the Georgia Supreme Court's determination that Holsey's child abuse evidence is "largely cumulative" of his collateral evidence.  See Rhode, 582 F.3d at 1284 (summarizing evidence that petitioner alleged counsel deficiently failed to introduce).

"largely cumulative" of the collateral evidence is also an unreasonable determination of the facts as it relates to his uncontested borderline mental retardation. The only reference to Holsey's mental retardation during the sentencing phase was Regina Reeves reading the words "borderline mental retardation" from a report created when Holsey was fifteen. That testimony was as follows:

> Q: And I want you to read to the jury a portion of this psychological testing dated 7-25-80. And, again, just read the highlighted portion. The jury will be able to read the whole thing on this page and the next page. This is regarding Robert.
> A: It says "Robert evidenced in"—I'm sorry. "Robert evidenced an inappropriate effect [sic] during the evaluation. He smiled inappropriately and had difficulty maintaining thought patterns. At times he appeared unaware of his immediate environment, and in a world of his own." Another paragraph says, "present testing indicates Robert functions in the borderline mental retardation range of intelligence."
> Q: Borderline mental retardation range.
> A: Yes.

As the Georgia trial court found on collateral review, and as the Georgia Supreme Court did not dispute, Holsey's record was "read to the jury without any context or explanation of its significance." Indeed, although Regina was the only witness who had the opportunity to explain the meaning of this information during Holsey's sentencing, she testified on collateral review that she had never seen the report before she was asked to read it, had not discussed this testimony with

counsel in advance of trial, had never heard her brother described as borderline mentally retarded before she read those words to the jury, and had not even met the attorney who asked her to read these words before she did so. As a result, although the jury heard the words "borderline mental retardation" spoken during live testimony and again, once, by counsel during closing argument, the jury had no way of knowing what those words meant, either in general or as they relate to Holsey.

In contrast, on collateral review, Holsey presented testimony and written reports from four psychologists: Dr. Mark Cunningham, Dr. Jethro Toomer, Dr. Marc Einhorn, and Dr. Michael Shapiro. Both Dr. Cunningham and Dr. Toomer concluded that Holsey is mentally retarded. Dr. Einhorn, who was asked to evaluate Holsey by the state, and Dr. Shapiro, who had examined Holsey in preparation for trial, agreed at the very least that he is "in the borderline range" of mental retardation.

In the course of explaining his evaluation of Holsey as mentally retarded, Dr. Cunningham's testimony related accounts given by various adults who knew Holsey and concluded that Holsey's adaptive behavior in the area of communication was that of a six-year-old child. Dr. Cunningham related accounts of Holsey's inability to take care of his basic living needs. Holsey had "never

lived on his own . . . but always lived with either a woman that he was going with or a family member." He would give whatever money he earned to his living companion at the time, who would pay him the money as an allowance, sometimes reminding him how to count the money when she gave it to him. Holsey never had a bank account, was unable to shop for groceries or clothing by himself, was unable to use public transportation, and could not order food from a menu at a restaurant. While working at a Pizza Hut restaurant, Holsey's supervisors had tried to promote him from dishwasher to pizza maker, but Holsey was unable to follow the recipe for making the pizzas. In this area of testing, Dr. Cunningham placed Holsey's capacity as falling in the range of a four-year-old to six-and-a-half-year-old child.

Holsey's social adaptation was also years behind his biological age. Dr. Cunningham summarized several accounts of Holsey's social interaction in these terms:

> The description that he's a loner is not [that he is] a loner by choice; it's not that he is schizoid and is uninterested in relating to others, it's he wants the friends, he's just not able to relate on an adult to adult basis. With the kids in the household he lives in, with the girlfriend's kids, he got along famously with them, would play with them for hours. It's not that he's not interested in relating, it's that his relationship skills and capabilities are at a child level and that puts him out of sync as he attempts to relate to adults.

129

Similarly, Holsey's relationships with women in adulthood "all ultimately broke up as they identified that they were relating to an emotional child instead of an adult. . . . [U]ltimately they just couldn't tolerate the experience of being in an intimate relationship with a child." Dr. Cunningham gauged Holsey's social adaptive behavior as at the level of a five-year-old child.

In terms of self-direction, Dr. Cunningham related accounts given by other adults who knew Holsey that he was unable to direct himself toward goals as simple as cleaning the house or even cooking a basic meal. When confronted by another adult about his inability to perform these simple tasks, Holsey "would just slump his shoulders and hang his head and mumble about what he couldn't do very well." Testing in the area of self-direction placed Holsey at the functional level of a four-year-old child.

Summarizing his evaluation in these and other areas, Dr. Cunningham testified that Holsey operates, on average, at the level of an eight-year-old child in his adaptive behavior. He testified that, whereas mental retardation requires proof of deficits in only two of ten behavioral areas, Holsey was deficient in eight. Moreover, Dr. Cunningham testified that Holsey's IQ scores taken over a twenty-three year period by the Georgia Youth Development Center ("YDC"), by Dr. Einhorn, and by Dr. Cunningham himself, and which registered an IQ of 69, 70,

130

and 71, amounted to "an extraordinarily reliable demonstration of his actual intellectual capability" as these scores "cluster[ed] within three points."[9] Dr. Cunningham described Holsey's borderline mental retardation as "a catastrophic disability."[10]

Dr. Toomer's testimony also described Holsey's intellectual and behavioral capacity as lagging far behind his biological age. Dr. Toomer reported that Holsey registered scores at a fifth- or fourth-grade level in reading, math, and spelling tests administered as part of his assessment. Dr. Toomer's assessment was also

---

[9] When Dr. Shapiro performed a partial IQ test of Holsey before his trial, he obtained an IQ score of 79, however, Dr. Shapiro nevertheless agreed with every other expert to have examined Holsey that Holsey's intelligence falls at least in the borderline range of mental retardation. Moreover, as explained by Dr. Cunningham, the results of that test were not as reliable as the tests administered by the YDC and by Drs. Cunningham, Einhorn, and Toomer, because Dr. Shapiro administered only an incomplete subset of the tests administered on these other occasions. The only other contrary test administered to Holsey, the Culture Fair test administered by the Georgia Department of Corrections, was described by the psychologist who designed the test, Dr. Herbert Eber, as "not intended to be used for psychological diagnosis" and that those scores "have absolutely no validity for assessing IQ as defined by the DSM and are not valid for purposes of diagnosing or ruling out mental retardation."

[10] Although the majority apparently discredits Dr. Cunningham's description of Holsey's mental retardation because those precise words are not also found in the DSM-IV, see Majority op. at 29 n.7, even Dr. Sachy, the state expert witness whose testimony the majority finds convincing, stated during his deposition that he does not always follow the letter of the DSM-IV in diagnosing patients. Specifically, Dr. Sachy testified that the DSM-IV is, at most, "a good starting point for arriving at a diagnosis," but is not to be treated as a "diagnostic bible," and that he disagreed with its assessments in some areas. In any event, no witness for the state questioned the scientific basis for Dr. Cunningham's use of the term "catastrophic disability" in relation to borderline mental retardation.

131

consistent with Dr. Cunningham's conclusion that Holsey lagged far behind his age group in multiple areas of adaptive behavior.

Dr. Einhorn examined Holsey for the state, but he agreed with Holsey's experts that Holsey's test results and behavioral development met all three elements of the definition of mental retardation required by Georgia law. Consistent with test results obtained by Drs. Cunningham and Toomer, Dr. Einhorn's academic testing revealed that Holsey performs at a fourth- or fifth-grade level in reading, spelling, and arithmetic. He nevertheless opined that Holsey was not mentally retarded because he judged Holsey's impairments to have been caused by "cultural deprivation" and alcohol abuse instead of mental retardation.[11] Consistent with Holsey's experts' assessments, however, Dr. Einhorn testified that Holsey's mental functioning was between "low average" and "borderline" mental retardation. Einhorn also testified that his testing revealed no

---

[11] However, Dr. Cunningham explained that mental retardation is not contingent upon biological or neurological impairment, and can be the result of so-called "cultural deprivation" because "[m]ental retardation is independent of cause. And so whether or not your hardware was permanently stunted because you didn't get proper nurturance as a baby, because you were neglected or abused or were impoverished or ate lead paint or were dropped on your head . . . all of that is called mental retardation." Dr. Cunningham described Dr. Einhorn's assumption that a "cultural deficit" and "mental retardation" are mutually exclusive as "entirely inconsistent . . . with DSM-IV and with the American Association of Mental Retardation Standards" and is "not a professionally accepted stance or viewpoint." Similarly, Dr. Toomer testified that "when we talk about diagnosing mental retardation in individuals, the etiology is varied. And because . . . it is psychosocial or what have you does not in any way diminish the existence or the likelihood of the existence of mental retardation."

signs that Holsey was malingering, or dissembling in order to appear mentally retarded, which was also consistent with Dr. Cunningham's assessment that Holsey's responses to questions were the product of genuine effort.

Dr. Shapiro, who was retained by Holsey's trial counsel but who never testified during Holsey's trial or sentencing, testified on collateral review that Holsey is "in the borderline range" of mental retardation. Like Dr. Toomer, Dr. Shapiro testified that Holsey reads at a fourth-grade level.

Finally, even Dr. Thomas Sachy, a psychiatrist who examined Holsey on behalf of the state, offered testimony that would have been helpful to Holsey if put before a jury. Specifically, Dr. Sachy described mentally retarded individuals as often incapable of keeping jobs because they are unable to perform sequenced activities. This description was consistent with Holsey's evidence that he is unable to follow basic directions required to shop for groceries, cook a simple meal, or perform jobs more sophisticated than dishwasher or truck driver.[12] Dr. Sachy identified inability to maintain adult relationships as another characteristic

---

[12] It is not inconsistent with Holsey's evidence that he maintained menial jobs as a tray-loader at a chicken processing plant or as a dishwasher at a Pizza Hut restaurant because of the extraordinarily simple, repetitive nature of both jobs. Or, as Dr. Cunningham explained, it was not surprising that Holsey managed to keep these jobs despite his impairments because "mentally retarded individuals, if the task is simple and routine and they have some guidance, they're likely to be excellent employees in that area because it fully engages them and they get a sense of pride in doing that."

feature of mental retardation, and this description was corroborative of testimony by Holsey's experts and former girlfriends that he was unable to interact on an adult level. Further, Dr. Sachy acknowledged that inability to operate simple machinery, such as a washing machine, without instructions and supervision may be consistent with mild mental retardation, just as Holsey's collateral testimony revealed that Holsey was unable to operate a washing machine. Dr. Sachy emphasized his view that the intellectual element of borderline retardation is the most important element in diagnosing that condition, and he unequivocally testified that Holsey's IQ scores place him in the borderline range of mental retardation.

Clearly, Regina Reeves' unexplained reading of the words "borderline mental retardation range" cannot reasonably be called "largely cumulative" of this testimony. The cognitive and behavioral impairments that were painstakingly explained on collateral review by the psychologists are not a matter of everyday knowledge such that a jury will be reminded of them automatically merely by hearing the words "borderline mental retardation" spoken. Rather, the testimony by these experts would have enabled the jury to understand in concrete terms that Holsey suffers from the "cognitive and behavioral impairments" that reduce the moral culpability of mentally retarded and borderline mentally retarded offenders,

including Holsey's diminished capacity "to understand and process information, to communicate, to engage in logical reasoning, to control impulses, and to understand the reactions of others." Atkins v. Virginia, 536 U.S. 304, 318 (2002); see Brownlee v. Haley, 306 F.3d 1043, 1073 (11th Cir. 2002).[13]

The majority refers to Regina Reeves' sentencing phase testimony that Holsey "performed poorly in school, and was usually assigned to the next grade level instead of actually passing into that grade level," that Holsey "dropped out of school before finishing the tenth grade," and that Holsey was "'very slow' and a 'poor worker' who 'need[ed] help from home' but never got that help." Majority op. at 75-76. However, nothing in the testimony referred to describes the depth and severity of mental impairment that distinguishes a borderline mentally retarded defendant from the general population. See Atkins, 536 U.S. at 319 ("If the culpability of the average murderer is insufficient to justify the most extreme sanction available to the State, the lesser culpability of the mentally retarded offender surely does not merit that form of retribution."). To say that testimony describing Holsey as having academic difficulties that are shared by non-mentally retarded individuals "highlighted" the effects of Holsey's mental retardation

---

[13] "[I]t is abundantly clear that an individual 'right on the edge' of mental retardation suffers some of the same limitations of reasoning, understanding, and impulse control as those described by the Supreme Court in Atkins." Brownlee, 306 F.3d at 1047.

135

described on collateral review is to erase the distinction between mentally retarded persons and those who are not. See Atkins, 536 U.S. at 310 ("'By definition, [mentally retarded] individuals have substantial limitations not shared by the general population.'" (quoting Atkins v. Commonwealth, 534 S.E.2d 312, 325 (Va. 2000) (Koontz, J., dissenting))). Testimony that describes the impairments that are unique to mentally retarded individuals is necessary to distinguish the mentally retarded or borderline mentally retarded defendant from a defendant whose culpability is not decreased by this incapacity. Such testimony does not, as the majority claims, merely add "details" or elaborate on "themes" that have already been canvassed; instead, it is essential to give recognition to the "cognitive and behavioral impairments that make these defendants less morally culpable." Id. at 320. The sentencing phase testimony wholly failed to describe the effects of Holsey's borderline mental retardation.

### III. Holsey Received Ineffective Assistance of Counsel During the Penalty Phase of His Trial

Because the Georgia Supreme Court's decision is founded on the unreasonable factual determination that the sentencing phase testimony "highlighted" Holsey's abuse and borderline mental retardation such that his mitigating evidence was "largely cumulative," we must apply de novo review to

the prejudice component of Holsey's <u>Strickland</u> claim. <u>See</u> § 2254(d)(2); <u>Cooper</u>, 646 F.3d at 1353; <u>Jones</u>, 540 F.3d at 1288 n.5. Moreover, because the Georgia Supreme Court did not adjudicate the deficiency prong of Holsey's <u>Strickland</u> claim on the merits, we have no state-court adjudication of the deficiency prong to defer to. <u>See</u> <u>Rompilla</u>, 545 U.S. at 390.

## A.    Deficiency

To establish that his counsel provided ineffective assistance, Holsey must show that his counsel's performance was objectively unreasonable according to prevailing professional norms at the time of his trial. <u>See</u> <u>Strickland</u>, 466 U.S. at 687-88. It was well established throughout the time of counsel's preparation that an attorney representing a defendant in a capital case bears "'an obligation to conduct a thorough investigation of the defendant's background.'" <u>Johnson</u>, 643 F.3d at 931 (quoting <u>Williams</u>, 529 U.S. at 396). However, as in <u>Wiggins</u>, counsel gathered information about Holsey's childhood from a narrow set of sources: Holsey's school records, records from a state juvenile rehabilitation program where Holsey was sent when he was fifteen, and Holsey's criminal history. <u>See</u> 539 U.S. at 523-34. Although assistant counsel Brenda Trammel also conducted interviews of Holsey's mother and three sisters, these interviews were limited to discussing the "guilt/innocence" phase of Holsey's trial. At the state habeas

137

hearing, neither lead counsel Andy Prince nor Trammel recalled asking Holsey himself about his childhood. Moreover, although the abuse suffered by Holsey was severe and the knowledge of it widespread among community members who were available and willing to testify as mitigation witnesses, most of these witnesses were never contacted by trial counsel. See Cooper, 646 F.3d at 1352 (noting list of witnesses who were willing to testify and not contacted). Those individuals who were contacted simply were never asked for information about Holsey's upbringing. Even though counsel relied on Regina Holsey to present evidence about Holsey's family history, trial counsel never discussed the scope or subject matter of Regina Holsey's mitigation-phase testimony with her.

Moreover, "the information that trial counsel did acquire would have led a reasonable attorney to investigate further" and to discover the pervasive abuse in Holsey's background. See Williams, 542 F.3d at 1340. During the course of counsel's preparation for trial, Holsey's four sisters and his mother provided counsel with responses to a questionnaire posing generic questions about their knowledge of Holsey and his background. Several of these questionnaires contained vivid references to the abuse and poverty in Holsey's childhood. In particular, Regina Holsey's questionnaire reported that Holsey "was beaten with various cords, sticks, switches, brooms, shoes," and had been "choked" and "held

138

under water." Although counsel received these forms in advance of Holsey's trial, counsel did not discuss these obvious indications of abuse in their interviews with Holsey or his sisters. See Johnson, 643 F.3d at 932 ("No reasonable attorney [having been notified of abuse] would fail to interview members of his client's family who were readily available and could corroborate or refute the allegations of abuse."). Nothing in the record indicates that counsel chose to cut off their investigation into Holsey's childhood in light of signs that this inquiry would be fruitless or would lead to the discovery of adverse evidence. See Wiggins, 539 U.S. at 525 (finding performance deficient absent indications that further research would be useless).

Like counsel's inadequate investigation of Holsey's childhood abuse, counsel's investigation of Holsey's mental condition was deficient in failing to discover readily available evidence of his borderline retardation, in ignoring prominent leads that should have sparked further inquiry, and in lacking any strategic basis to forgo this investigation. Lead counsel Andrew Prince testified at the collateral evidentiary hearing that, prior to Holsey's sentencing, he had read the report from which Regina read at Holsey's trial, which revealed that Holsey, as a fifteen-year-old, functioned at a third-grade level and had an IQ of 70. The report also referred to Holsey as having a "borderline mental retardation range" of

139

intelligence and as exhibiting behavior that denoted "a prepsychotic disturbance." Indeed, lead counsel noted in his preparation materials that Holsey was "borderline mentally retarded." Moreover, assistant counsel Trammel testified at the evidentiary hearing that she noticed that Holsey was extremely slow from the first time she met him, and Prince documented Holsey's demeanor as "rather psychotic." Trammel also reviewed Holsey's school records and shared her notes with lead counsel Prince, in which she summarized Holsey's school performance as "pitiful." Further, Regina Holsey's questionnaire, which was submitted to counsel well in advance of trial, specifically referred to a paternal uncle who was mentally retarded and to mental health problems experienced by Holsey's mother and two of his sisters. As the Georgia habeas court found, however, and as the Georgia Supreme Court did not dispute, Prince admitted that he never considered presenting any mental retardation evidence at either phase of trial. This is not surprising given his own testimony that he was drinking heavily during this time and the malpractice suit and criminal charges concerning his theft of client funds.

Based upon the mental health records that were available to Prince, "any reasonably competent attorney would have realized" that pursuing additional information about Holsey's mental deficiency "was necessary to making an informed choice" about mitigation strategy. See Wiggins, 539 U.S. at 525.

However, Brenda Trammel, who was ostensibly in charge of mitigation, testified that by the time she joined the case, Prince had already decided that mental health issues were not going to be pursued or presented.[14]  This record gives no indication that Prince's failure to pursue apparent leads into Holsey's mental incapacity was a matter of "reasoned strategic judgment;"instead, every indication is that this defect in preparation "resulted from inattention" alone.  Id. at 526.

**B.      Prejudice**

To satisfy the prejudice standard of Strickland, Holsey must show "a reasonable probability that . . . the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death" if mitigating evidence of his childhood abuse and mental retardation had been introduced.  See Strickland, 466 U.S. at 695.  Because Georgia requires that the death penalty may be imposed only by a unanimous jury verdict,[15]  Holsey need

---

[14] Prince obtained funds from the court to pay for a psychological assessment by Dr. Michael Shapiro, but, as in Ferrell v. Hall, counsel's use of Dr. Shapiro was "unjustifiably and unreasonably circumscribed."  640 F.3d 1199, 1227 (11th Cir. 2011).  Prince used Dr. Shapiro only to assess competency to stand trial and did not inquire about mental limitations relevant to mitigation.  Shapiro testified that counsel provided him with only a two-page summary of Holsey's personal and family history.  Dr. Shapiro created no report of his findings, and did not make any diagnosis as to Holsey's mental condition in advance of trial.  Whether or not counsel ever discussed Shapiro's examination with him, the limited evidence of counsel's interaction with Dr. Shapiro reveals that Shapiro's investigation of Holsey's mental condition was, at best, a "sharply limited inquiry."  Id.

[15] See supra n. 1.

141

only show a "reasonable probability that at least one juror would have struck a different balance" between aggravating and mitigating factors. Wiggins, 539 U.S. at 537. "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of Holsey's original sentencing proceeding. Strickland, 466 U.S. at 694. The likelihood of a different outcome must be "substantial," but Holsey need not show that his counsel's errors "more likely than not altered the outcome." Harrington v. Richter, 131 S. Ct. 770, 791 (2011) (internal quotation marks omitted).

As detailed above, "[t]his is not a case in which the new evidence would barely have altered the sentencing profile" presented to the sentencing jury. Porter, 130 S. Ct. at 455 (internal quotation marks omitted). Holsey's mitigating evidence is precisely the potent combination of child abuse and borderline mental retardation that was held to establish prejudice in Williams v. Taylor. See 529 U.S. at 398. Moreover, neither of the state's expert witnesses, Drs. Sachy and Einhorn, disputes that Holsey is borderline mentally retarded, both witnesses agree with Holsey's experts that he was not "malingering" or faking the effects of retardation, and no witness has called into question Holsey's evidence that he was the victim of severe abuse throughout his childhood and adolescence. Therefore, Holsey's mitigating evidence is especially strong because it is "consistent,

142

unwavering, compelling, and wholly unrebutted." Ferrell v. Hall, 640 F.3d 1199, 1234 (11th Cir. 2011).

This is not a case where the aggravating factors so clearly outweighed the mitigating circumstances that there is no substantial probability that one juror would have weighed them differently. The jury's sentence of death was based on four statutory aggravating circumstances. The first of these factors was based on Holsey's prior conviction for armed robbery when he was eighteen years old, in which he robbed a convenience store using a brick. The remaining three were derived from the immediate circumstances of Holsey's crime: that the shooting of Deputy Robinson occurred while Holsey fled the scene of a robbery, that it occurred in order to evade arrest, and that Deputy Robinson was a peace officer in the line of duty. See Ga. Code Ann. § 17-10-30(b)(2), (8), (10). In addition, the state presented evidence of the non-statutory aggravating circumstances that Holsey had stabbed a man in a barroom fight and that, as Holsey attempted to flee the barroom fight, a man handed him a rifle with which he shot at a pursuer.

However, these aggravating circumstances were weakened by defense evidence at trial and would have been further diminished by the evidence presented on collateral review. As to the three statutory aggravators relating to the crime itself, the Supreme Court and our circuit both have held mitigating evidence

143

of child abuse and mental impairment like Holsey's to create a reasonable probability of outweighing evidence of crimes that were far more aggravated than this one. In <u>Rompilla</u>, the Supreme Court held that mitigating evidence of abuse and mental infirmity created a reasonable probability of outweighing aggravating evidence of murder involving torture, a simultaneous felony, and a history of violent crime including rape at knifepoint. <u>See</u> 542 U.S. at 378, 392-93; <u>id.</u> at 402 (Kennedy, J., dissenting). In <u>Williams</u>, the Court held that omitted mitigating evidence of abuse and borderline retardation may have outweighed a robbery and murder that was aggravated by the defendant's subsequent "violent assaults on elderly victims" and arson committed while in prison. <u>See</u> 529 U.S. at 368-69, 398. Likewise, in <u>Cooper</u>, we held that mitigating evidence of child abuse alone, without mental impairment, created a reasonable probability of outweighing evidence of the crime, which was an "extremely aggravated triple homicide" involving the execution-style murder of restrained victims. <u>See</u> 646 F.3d at 1338-41, 1353-56. And in <u>Johnson</u>, we held that mitigating child abuse evidence alone, without mental impairment, created a reasonable probability of outweighing evidence of the defendant's murder of two victims and five separate aggravating circumstances, including that the murders were committed "in a cold, calculated, and premeditated manner." <u>See</u> 643 F.3d at 917.

144

The murder involved in this case was "no more brutal than the murder[s] in th[ese] case[s]." Id. at 937. And the culpability associated with this murder would have been diminished by the collateral expert testimony describing the effect of Holsey's borderline retardation on his limited capacity "to understand and process information, to learn from experience, to engage in logical reasoning, or to control impulses." Atkins, 536 U.S. at 320. Similarly, as to the fourth aggravating factor of Holsey's prior conviction at the age of eighteen, the weight of this aggravating circumstance would have been reduced by the collateral testimony describing the extent of the abuse that Holsey suffered throughout his adolescence, as well as his borderline mental retardation. See Jackson v. Herring, 42 F.3d 1350, 1369 (11th Cir. 1995) (holding that aggravating evidence of murder would have been diminished by "[e]vidence showing the genesis of [the defendant's] irrational rage through an abusive upbringing").

Regarding the non-statutory aggravating evidence regarding the barroom fight, Kenneth Simmons, the person who was stabbed, testified that he "had words with" Holsey about a fight between Holsey and Simmons' cousin that occurred earlier that night. According to Simmons, Holsey, otherwise unprovoked, then stabbed him in the back with a knife. Simmons testified that he could not remember what he and Holsey had said to each other. In contrast, four witnesses

145

who were present on the night of the bar fight testified that Holsey did not start the fight and stabbed Simmons only after Simmons had bludgeoned Holsey in the back of the head with a brick, causing Holsey to bleed profusely from the head. Lucille Kendrick testified that Holsey was dancing with her when Simmons came up from behind Holsey and hit him in the back of the head with an object in his hand, and Holsey started bleeding from the head. Holsey pushed Kendrick away from him, leaving some of his blood on her shirt, and started fighting Simmons.

Similarly, Clifford Holsey, the owner of the bar who is not a relative of Wayne Holsey, consistently described Kenneth Simmons and Simmons' cousin, Scottie Simmons, as the aggressors in the fight. Specifically, Clifford Holsey testified that Simmons, his cousin, and an accomplice were coming from another club to Clifford's bar to attack Holsey. When Simmons arrived, Clifford Holsey went outside to meet him and his companions and told them not to interfere with Holsey, who was already inside the bar with his girlfriend, because "he is not bothering anybody. Wayne is not going to bother you if you don't bother him." However, Simmons "slipped out from around me and went on inside the place," and once inside he "went in there and jumped on Wayne. And Wayne had to defend himself because Scottie [Simmons] and his family were going to attack him."

146

Further, Belinda Hawkins, Holsey's girlfriend who was with him on the night of the altercation, testified that Simmons and two others had come to the club to attack Wayne because of an incident that had occurred earlier that night. She remembered Holsey coming to her in the bar with blood running from his head. She asked him what happened, and Holsey told her Simmons had hit him with a brick from behind. Like Clifford Holsey and Lucille Kendrick, she testified that Wayne Holsey did not start the fight. Finally, all of this testimony was corroborated by Regina Reeves, who testified at trial that Holsey had "three holes in his head" as a result of the bar fight, one on the temple, and two on the back side of his head, all of which required stitches. Bertha Simmons, who is not related to Kenneth or Scottie Simmons, testified that she did not know who started the fight but did see Holsey stab Kenneth Simmons four times.

We cannot say that a reasonable jury would weigh the evidence of the bar fight heavily against Holsey. Rather, the weight of the testimony showed that Simmons attacked Holsey first from behind and that Simmons came to the bar with two companions for the specific purpose of assaulting Holsey. The weight of the testimony revealed that Holsey stabbed Simmons in the midst of a fight that started after Simmons inflicted a serious head wound on Holsey.

As for the evidence that Holsey fired a rifle at Kenneth's cousin, Scottie Simmons, the aggravating weight of this testimony was diminished by Scottie Simmons' admission that he was pursuing Holsey in order to attack him as Holsey left the bar.  Moreover, Holsey's experts testified on collateral review that Holsey is prone to follow the instructions from others as a consequence of his mental retardation, and Holsey fired the rifle at Simmons only after a third person handed the rifle to Holsey and instructed him on how to cock, aim, and fire it as Simmons approached.  See Ferrell, 640 F.3d at 1234 (holding prejudice established in part where "evidence of [the petitioner's] mental illness measurably weakens the aggravating circumstances" by providing an explanation for the petitioner's conduct);  Hardwick v. Crosby, 320 F.3d 1127, 1185 (11th Cir. 2003) ("[P]sychiatric mitigating evidence not only can act in mitigation, it also could significantly weaken the aggravating factors.") (internal quotation marks omitted).

Although the majority claims that testimony from defense psychologists would have led to introduction of testimony by Dr. Shapiro and Dr. Sachy that Holsey's conduct "evidenced an antisocial personality disorder,"[16] neither doctor gave an opinion that Holsey exhibited this disorder.  At most, Dr. Sachy opined, hypothetically and in the abstract, that aggravated assault, fighting, and successful

---

[16] Majority op. at 96.

148

armed robbery were each individually more consistent with antisocial personality than with mental retardation. However, Dr. Sachy made no diagnosis, and gave no opinion, about Holsey, and made no conclusions based on any review of Holsey's conduct in particular. For his part, Dr. Shapiro repeatedly <u>refused</u> to make an antisocial personality diagnosis or to give any opinion about antisocial personality disorder based on the information available to him, despite counsel for the state's persistent questioning.

Furthermore, many aspects of Dr. Sachy's testimony would have been undermined on cross examination or rebutted by Holsey's experts. Specifically, although Dr. Sachy testified that Holsey does not show signs of "gross neurological disfunctioning" or physical abnormality, and that Holsey's cognitive functioning was "grossly intact," he admitted on cross examination that none of these features is necessarily correlated with mental retardation. In addition, Dr. Sachy readily admitted that, because he is a psychiatrist and not a psychologist, he was unable to criticize any of the testing conducted by Drs. Cunningham and Toomer, and even Dr. Einhorn, all of which registered scores falling within the range of mental retardation.

Moreover, Holsey's expert Dr. Cunningham was prepared to offer persuasive criticism of Dr. Sachy's assessment that would have pointed out flaws

149

in his methodology and, overall, described it as relying on scientifically and statistically inappropriate, selective information. In particular, Dr. Sachy testified that his opinion was based on Holsey's physical appearance [17] and on Holsey's use of words that Dr. Sachy deemed "complex," which he explained were the "single most significant thing" that he relied upon to form his diagnosis.[18] However, Dr. Sachy admitted that his opinion that these words are contraindicative of mental retardation was based on his own subjective judgment rather than on any normed survey, such as the testing that formed the basis of Holsey's experts' opinions. Asked to justify his reliance on vocabulary as a measure of mental retardation, Dr. Sachy stated, "what separates us from lower animals than our language skills [sic]? . . . I mean, people say when you open your mouth that's when other people find out you're stupid." At several other points, Dr. Sachy related his view that Holsey's conduct during his crime was not indicative of mental retardation in part because the conduct was not "stupid" or was "non-silly." He also stated that, in

---

[17] In response, Dr. Cunningham testified that abnormal physical characteristics are generally indicative only of severe mental retardation and not relevant to Holsey's contention that he is mildly mentally retarded.

[18] The words or statements that Dr. Sachy identified were the words "forbidden" (pronounced by Holsey as "forbidded"), "subpoena," "animosity," "coverup," and the phrases "unconditional love," "don't know if I'm coming or going," "things happen for a reason," and "my life is at stake."

conducting his assessment, he was "looking for . . . blatant, silly, juvenile, mentally retarded . . . ways of behaving that make a person dysfunctional. . . . I think people used to call them [mentally retarded people] simple . . . That was the terminology at the time. And I just did fail to find that in the record, anything significant indicating a real simplicity." This testimony corroborates Dr. Cunningham's criticism that Dr. Sachy relied on scientifically inappropriate anecdotes, including stereotypes about mentally retarded persons, rather than on a statistically or scientifically valid method by which to assess mental retardation. Dr. Cunningham testified that Dr. Sachy's reliance on vocabulary is not an appropriate basis on which to diagnose mental retardation because, whereas "systematic assessment of vocabulary is one of ten or eleven subtests in the full scale IQ test, . . . unsystematic subjective evaluation is not at all a reliable way of diagnosing mental retardation." Therefore, excluding a diagnosis of mental retardation based on anecdotal evidence of vocabulary "would be an extraordinarily inappropriate application to make." In contrast, neither Dr. Sachy nor Dr. Einhorn offered any criticism of the methodology and assessments conducted by Drs. Cunningham and Toomer. Introducing Holsey's mitigating evidence of child abuse and borderline retardation would not have led to the

151

introduction of significant aggravating evidence beyond what the jury heard during Holsey's original sentencing. [19]

Because we must presume that the jury evaluating the evidence is acting "reasonably, conscientiously, and impartially," see Strickland, 466 U.S. at 695, I cannot believe that one juror hearing all of the mitigating evidence would not credit Holsey's experts and lay witnesses and find Holsey to be either fully mentally retarded or borderline mentally retarded and so diminished in his cognitive and behavioral capacity as to be either ineligible for or undeserving of the death penalty. When combined with Holsey's evidence of his horrific child abuse, none of which was presented to his sentencing jury, there is a substantial probability that one juror would not have voted in favor of the death penalty had this evidence been introduced by competent counsel. See Wiggins, 539 U.S. at 537; Williams, 529 U.S. at 398. Accordingly, the Sixth Amendment requires that Holsey receive a new sentencing hearing.

---

[19] The majority references Holsey's arrests in 1982 and 1983 for simple battery and shoplifting, and in 1990 for carrying a concealed firearm, however, both of the earlier arrests occurred during Holsey's abuse- and poverty-stricken adolescence, and the 1990 concealed-weapon charges were dropped. And although Holsey's prison records reflect some disciplinary violations, the records also contain mitigating statements about his conduct, such as those from his activity counselor that Holsey "appears honestly interested in staying out of any trouble" and "is a quiet individual [who] appears to stay pretty much to himself."